201 F.3d 1186 (9th Cir. 2000)
 AMERICAN RIVERS; PACIFIC RIVERS COUNCIL; OREGON NATURAL RESOURCES COUNCIL; WATERWATCH OF OREGON; and FRIENDS OF THE EARTH, Petitioners, UNITED STATES DEPARTMENT OF INTERIOR, Petitioner-Intervenor,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent, EUGENE WATER AND ELECTRIC BOARD, Respondent-Intervenor.
OREGON DEPARTMENT OF FISH AND WILDLIFE, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
EUGENE WATER AND ELECTRIC BOARD, Respondent-Intervenor.
 No. 98-70084, No. 98-70079
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted January 13, 1999
Filed August 11, 1999
Amended January 14, 2000
 [Copyrighted Material Omitted]
 COUNSEL: Todd D. True and Kristen L. Boyles, Earthjustice Legal Defense Fund, Seattle, Washington, for petitioners American Rivers et al.;
 Jas Jeffrey Adams, Justice Department, State of Oregon, Salem, Oregon, for petitioner Oregon Department of Fish and Wildlife.
 
 
 1
 Sean H. Donahue, United States Department of Justice, Environmental & Natural Resources Division, Washington D.C., for petitioner-intervenor United States Department of Interior.
 
 
 2
 John H. Conway and John S. L. Katz, Federal Energy Regulatory Commission, Washington, D.C., for the respondent.
 
 
 3
 Donald A. Haagensen, Haagensen & Lloyd, Portland, Oregon and Gail A. Greely, Alameda, California, for the respondent-intervenor Eugene Water & Electric Board.
 
 
 4
 Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, Washington, for amicus curiae Skokomish Indian Tribe;
 
 
 5
 David J. Cummings, Nez Perce Tribe Office of Legal Counsel, Lapwai, Idaho, for amicus curiae Nez Perce Tribe.
 
 
 6
 Brian J. McManus, Jones, Day, Reavis & Pogue, Washington, D.C., for amici curiae American Public Power Association et al.
 
 
 7
 Mark L. Bubenik, Chief Assistant City Attorney, Tacoma, Washington, for amicus curiae City of Tacoma, Washington.
 
 
 8
 Petitions for Review of an Order of the Federal Energy Regulatory Commission Before: Edward Leavy, M. Margaret McKeown, and Kim McLane Wardlaw, Circuit Judges.
 
 OPINION
 WARDLAW, Circuit Judge:
 
 9
 At stake in these consolidated petitions is the continued operation of two
 
 
 10
 Hydroelectricpower facilities located in Lane County, Oregon along a twenty-five mile stretch of the McKenzie River. The petitioners,[1] a coalition of conservation/environmental organizations and the Oregon Department of Fish and Wildlife, challenge the decision of the Federal Energy Regulatory Commission ("FERC" or the "Commission") to reissue a hydropower license to the incumbent licensee, the Eugene Water and Electric Board ("EWEB").[2] Specifically, the petitioners contend that the Commission granted the disputed license (i) without conducting the requisite environmental analysis under relevant provisions of the Federal Power Act ("FPA"), 16 U.S.C. S 791a et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. S 4321 et seq., and (ii) in violation of sections 10(j) and 18 of the FPA. For the reasons set forth below, we grant in part and deny in part the petitions for review.
 
 
 11
 * The license under review authorizes the continued operation of the 14.5-megawatt Leaburg Hydroelectric Project and the 8-megawatt Walterville Hydroelectric Project for a duration of 40 years. See Eugene Water & Elec. Bd., 78 Fed. Energy Reg. Comm'n Rep. (CCH) P 62,207, at 64,693 (Mar. 24, 1997) ("Order Issuing New License").[3] The Leaburg and Walterville facilities have operated since 1930 and 1911, respectively. The Commission's predecessor, the Federal Power Commission, granted original FPA hydropower licenses to the Walterville development in 1967 and the Leaburg development in 1968. See In re City of Eugene, 37 F.P.C. 979 (May 23, 1967); In re City of Eugene, 39 F.P.C. 904 (June 3, 1968). Both licenses expired by their terms on December 31, 1993. After the licenses expired, EWEB managed both developments under separate annual licenses by operation of FPA section 15(a).[4]
 
 
 12
 The Leaburg development, the project's upstream facility, consists of a dam, canal, powerhouse facilities, a tailrace, and a power substation. The dam creates a fifty-seven acre backwater called Leaburg Lake which extends approximately 1.5 miles upstream. On each side of the dam are fish ladders, only one of which is operational. On the upstream side of the dam, intake gates divert water through a downstream migrant fish screen into the five-mile Leaburg power canal. The diverted water passes through the power plant forebay into the two turbine Leaburg powerhouse. The water returns to the McKenzie River through a 1,100-foot tailrace. The bypassed reach of the McKenzie between the entrance to the Leaburg canal and the point where the diverted water rejoins the river is 5.8 miles long.
 
 
 13
 Six miles downstream, headworks divert water from the McKenzie into the unscreened, four-mile Walterville power canal. The Walterville canal feeds into a single-turbine powerhouse from which water returns to the McKenzie through a two-mile tailrace. The Walterville canal bypasses a 7.3 mile stretch of the McKenzie.
 
 
 14
 The Director issued the disputed license on March 24, 1997, pursuant to the FPA.[5] Section 4(e) of the FPA empowers the Commission to issue licenses for hydroelectric projects on waterways that are subject to congressional regulation under the Commerce Clause. See 16 U.S.C.S 797(e) (1994). Section 10(a) of the FPA authorizes the Commission to issue such licenses subject to conditions that the Commission finds best suited for power development and other public uses of the nation's waters. See 16 U.S.C. S 803(a) (1994). In the mid-1980's, Congress amended these provisions to realize an increased sensitivity to environmental concerns, directing the Commission to devote greater consideration to a project's overall effect on fish and wildlife. See Electric Consumers Protection Act of 1986 ("ECPA"), Pub. L. No. 99-495, 100 Stat. 1243 (1986) (codified principally at 16 U.S.C.SS 797(e), 803(a)(1), 803(j)).[6] The new license reflects many of these concerns and would require EWEB to construct several new facilities and provide other measures for the benefit and protection of the fish populations that pass through and reside in the project area. See Order Issuing New License, 78 Fed. Energy Reg. Comm'n Rep. (CCH) at 64,706-719.[7] From a power standpoint, the new license authorizes EWEB to increase the project's generation capacity from 22.5 megawatts to 23.2 megawatts. See id. at 64,708. Under the terms of the license, EWEB would achieve this increased generation capacity by raising the water level at Leaburg Lake by 18 inches, constructing fixed sill dams or other diversion structures at the head of the Walterville power canal, replacing the turbine runners at both powerhouses, and excavating the Walterville tailrace. See id. at 64,701-703. The license also would increase the minimum flows[8] in the bypassed reaches below the diversions of both developments to1,000 cubic feet per second. See id. at 64,703.
 
 
 15
 During the relicensing deliberations, the Director considered the final environmental impact statement prepared by the Commission's environmental staff.[9] The Commission's staff issued the final environmental impact statement on January 8, 1997, after soliciting and receiving comments on a draft. The staff had evaluated the proposed project conditions set forth in EWEB's application, alternatives to the proposals, resource agency recommendations, Commission staff-developed recommendations, and public comments. Specifically, the staff considered EWEB's relicensing proposal and five alternatives: (1) the "no action" alternative; (2) issuing a new license to EWEB with all of the modifications and enhancement measures proposed by the resource agencies; (3) issuing a new license which would combine some of the measures recommended by resource agencies with others developed by Commission staff; (4) issuing a nonpower license; and (5) project retirement. The final environmental impact statement defined the "no action" alternative as the existing projects as "operate[d] under the terms and conditions of their original licenses." Leaburg-Walterville Hydroelectric Project (FERC Project No. 2496), Oregon, Final Environmental Impact Statement, S 2.3, at 2-6 (Dec. 1996). Under this alternative, "[n]o new environmental protection or enhancement measures would be implemented." Id. The final environmental impact statement stated that it had "use[d] this alternative to establish baseline environmental conditions for comparison with other alternatives." Id.
 
 
 16
 The Commission's staff also examined the conditions submitted by the state and federal fish and wildlife agencies under color of FPA sections 10(j) and 18.[10] The staff adopted many of the fifty-six recommendations designated pursuant to section 10(j). The final environmental impact statement, however, stated that twenty-one of the fifty-six recommendations were outside the scope of section 10(j). The Commission's staff concluded that these recommendations either did not serve to protect fish and wildlife resources or conferred final authority over the level of enhancement and project operations upon the agencies rather than the Commission. The final environmental impact statement nevertheless considered and adopted many of these submissions under FPA sections 10(a) and 4(e) which grant the Commission broader latitude to balance environmental and development interests. The Commission's staff also recommended the outright adoption of the federal agencies' section 18 conditions which required implementation of fish ladders and fish screens but determined that the remaining conditions lodged under color of section 18 did not constitute "fishway prescriptions." Again, the Commission analyzed and adopted many of these measures under sections 10(a) and 4(e).[11]
 
 
 17
 After issuing the final environmental impact statement, the Commission's staff convened a meeting with several of the parties, attempting to resolve inconsistencies between the petitioners' recommendations and the requirements of FPA section 10(j). The Commission's efforts proved successful, for after the meeting, only three major areas of disagreement remained: (1) whether to raise the water level of Leaburg Lake; (2) whether to install diversion dams at the Walterville facility; and (3) the appropriate minimum instream flows in the Leaburg and Walterville bypass reaches. The Director's order answered the first two questions in the affirmative and set the minimum instream flow at 1,000 cubic feet per second. See Order Issuing New License, 78 Fed. Energy Reg. Comm'n Rep. (CCH) at 64,701-703.
 
 
 18
 Two months after the section 10(j) dispute resolution meeting between the resource agencies and Commission staff, the Secretary of Interior filed modifications to its section 18 prescriptions for the Director's consideration. These modified prescriptions met with substantially the same results as the resource agencies' earlier submissions. Like the Commission staff before him, the Director found that the Secretary's prescriptions relating to fish ladders and fish screens constituted section 18 fishways but nevertheless did not incorporate the submissions as prescribed, electing instead to establish a plan under which EWEB would "consult with the agencies in developing final designs and monitoring plans for Commission approval." Id. at 64,699 (implementing license articles 416, 418, and 420). As to the remaining prescriptions, the Director held that the submissions, even as modified, were beyond the scope of section 18. See id. at 64,700. The Director explicitly stated for the record the basis for the rejection or reclassification of most of the submissions. See id. at 64,699-700.
 
 
 19
 American Rivers, the United States Department of the Interior, the National Marine Fisheries Service ("NMFS"), and ODFW timely sought rehearing, forwarding the same arguments which had divided the parties since the issuance of the final environmental impact statement.[12] On November 26, 1997, the Commission considered and rejected the rehearing requests. See Eugene Water & Elec. Bd., 81 Fed. Energy Reg. Comm'n Rep. (CCH) P 61,270, at 64,706 (Nov. 26, 1997) ("Order on Rehearing"). These petitions followed. Because the petitioners renew on this appeal the specific objections proffered in their administrative petitions for rehearing, this Court has jurisdiction pursuant to 16 U.S.C. S 825l(b).[13]
 
 II
 
 20
 As a preliminary matter, we discuss the methodology we employ in reviewing the Commission's licensing decision. The petitioners contest the Commission's decision under two statutes, the FPA and NEPA. The petitioners first challenge the sufficiency of the Commission's environmental analysis under the FPA and NEPA, arguing that the terms of the new license exacerbate the already degraded conditions in the McKenzie River basin. The petitioners next contend that the FPA does not authorize the Commission to make threshold determinations of whether a given agency recommendation or proposed license condition satisfies the requirements of FPA section 10(j) or section 18. The petitioners' FPA contentions require consideration of substantive issues of statutory construction, whereas the petitioners' NEPA challenges require analysis of the Commission's compliance with NEPA's various procedural requirements. These two lines of inquiry proceed along different analytic paths which are subject to separate standards of review.
 
 
 21
 Under the FPA, we grant conclusive effect to the Commission's findings of fact if such findings are supported by substantial evidence. See 16 U.S.C. S 825l(b); Muckleshoot Indian Tribe v. Federal Energy Regulatory Comm'n, 993 F.2d 1428, 1430 (9th Cir. 1993). Where, however, the petitioners call into question the Commission's understanding of its statutory mandate, our review is de novo. See Skokomish Indian Tribe v. Federal Energy Regulatory Comm'n, 121 F.3d 1303, 1306 (9th Cir. 1997). The Commission's interpretation of the FPA implicates the now familiar process of reviewing agency actions exemplified by the Supreme Court's watershed opinion in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). Chevron set forth the two-part test against which courts review an agency's construction of the statute it administers. See id. at 842-43, 104 S. Ct. at 2781-82. Under the Chevron formulation:
 
 
 22
 First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter . . . . If, however, the court determines Congress has not directly addressed the precise question at issue, the . . . question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 23
 Id.; accord Rain song Co. v. Federal Energy Regulatory Comm'n, 106 F.3d 269, 272 (9th Cir. 1997). The two-step Chevron framework thus allows this Court to defer to the Commission's interpretations of the statutory provisions it administers, but we remain "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Natural Resources Defense Council v. United States Dep't of Interior, 113 F.3d 1121, 1124 (9th Cir. 1997) (citing Chevron, 467 U.S. at 843 n.9, 104 S. Ct. at 2781 n.9) (internal quotations omitted).[14]
 
 
 24
 A different set of principles guides our review under NEPA because "NEPA does not mandate particular substantive results, but instead imposes only procedural requirements." Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517, 523 (9th Cir. 1994) (citing Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558, 98 S. Ct. 1197, 1219, 55 L. Ed. 2d 460 (1978)). Our task under NEPA therefore "is simply to ensure that [FERC] has adequately considered and disclosed the environmentalimpact of its actions . . . ." Association of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1183 (9th Cir. 1997) (citing Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97-98, 103 S. Ct. 2246, 2252-53, 76 L. Ed. 2d 437 (1983). For NEPA actions challenging the adequacy of an environmental impact statement, this circuit has fashioned a "rule of reason" to determine whether the agency has engaged in a "reasonably thorough discussion of the significant aspects of probable environmental consequences." Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997) (internal quotations and citation omitted). Under this standard, "[o]nce [we are] satisfied that a proposing agency has taken a `hard look' at a decision's environmental consequences, [our] review is at an end." Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)); see also Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1376 (9th Cir. 1998) ("The rule of reason analysis and the review for an abuse of discretion are essentially the same.").
 
 
 25
 These standards reflect the axiomatic distinction between "the strong level of deference we accord an agency in deciding factual or technical matters [and] that to be accorded in disputes involving predominantly legal questions." Alaska Wilderness Recreation and Tourism Ass'n v. Morrison, 67 F.3d 723, 727 (9th Cir. 1995). It is with these principles that we turn to merits of the petitions.
 
 III
 
 26
 The petitioners first object to the Commission's use of existing environmental conditions at the Leaburg-Walterville Project as a "baseline"[15] against which to evaluate alternatives to the EWEB relicensing proposal. The petitioners argue that the Commission's use of such a baseline preordained its adoption of the EWEB proposal. The Commission rejected this argument. As the Commission explained in the Order on Rehearing, "[n]either the labels placed on alternatives, nor the choice of baseline will, in our judgment, alter the determination of the reasonable alternatives at relicensing." 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,327. We conclude that the Commission's choice of baseline and analysis of alternatives complied with the substantive and procedural requirements of both the FPA and NEPA.
 
 A. The Choice of Baseline
 
 27
 Petitioners contend that FERC ignores continuing impacts and the environmental impacts caused by ongoing operation. In effect, the petitioners contend that the FPA requires the Commission to evaluate the EWEB proposal against a baseline embodying a theoretical reconstruction of what the McKenzie River basin would be like today had the Leaburg and Walterville projects not been in place for the greater part of this century. To evaluate this argument under Chevron, we first must determine whether Congress has spoken with sufficient clarity to foreclose the Commission's alternative interpretation. See Rainsong, 106 F.3d at 273.
 
 
 28
 Our construction of the FPA commences, as it must, with the statute's text. See United States v. Hockings, 129 F.3d 1069, 1071 (9th Cir. 1997). The FPA, however, nowhere defines or even mentions the concept of an environmental baseline. Therefore, as the statutory language evinces no specific congressional directive, we look next to its legislative history. See Northwest Forest Resource Council v. Glickman, 82 F.3d 825, 830-31 (9th Cir. 1996).[16]
 
 
 29
 The legislative history of the FPA supports, but does not directly sanction, the Commission's decision to use an existing-project baseline. The ECPA conference report comes nearest to evidencing congressional intent on this issue. The report states that "[i]n exercising its responsibilities in relicensing, the conferees expect FERC to take into account existing structures and facilities in providing for these nonpower and nondevelopmental values." H.R. Conf. Rep. No. 99-934, at 21-22 (1986), reprinted in 1986 U.S.C.C.A.N. at 2537, 2538. More emphatically, the report "noted that the Commission must take into account existing structures and facilities . . . in relicensing proceedings under section 15." Id. at 2543 (emphasis added). The petitioners acknowledge this legislative imperative but assert that the Commission altogether excluded from consideration the environmental harms caused by these existing structures and facilities, thereby precluding "equal consideration" of non-power values as mandated by FPA section 4(e).[17] This contention lacks merit, for the record demonstrates numerous instances where the Commission diligently evaluated the adverse environmental impacts on the McKenzie River basin caused by the operation of the Leaburg and Walterville projects.
 
 
 30
 The petitioners also proffer excerpts from the ECPA house report in support of their position that the Commission must evaluate relicensing issues "in light of today's standards and concerns," and that "procedures and substance applicable to original licenses, including the treatment of nondevelopmental values, apply fully in relicensing." H.R. Rep. No. 99-507, at 33-34 (1986), reprinted in 1986 U.S.C.C.A.N. 2496, 2521. This Court's review, however, does not turn on single words or phrases in the legislative record, see United States ex rel. Fine v. Chevron, U.S.A., Inc., 72 F.3d 740, 744 (9th Cir. 1995) (en banc), especially when they are taken out of context. When read conjunctively with the surrounding text, these quotations--and indeed the entire house report-display nothing more than Congress' intent to emphasize that the Commission's section 4(e) "equal consideration" responsibilities apply to relicensing as well as original licensing proceedings.[18] A fair reading of the report as a whole thus precludes the petitioners' treatment of the legislative history and convinces us that "Congress has not directly addressed the precise question at issue." Chevron, 467 U.S. at 843, 104 S. Ct. at 2782. We therefore proceed to the second strand of our inquiry under Chevron.
 
 
 31
 This prong of Chevron instructs us that where Congress implicitly leaves a gap for the agency to fill, there is a "delegation of authority to the agency to elucidate . . . the statute." Chevron, 467 U.S. at 843-44, 104 S. Ct. 2782. We will not substitute our own construction of the statute unless we determine that the Commission's interpretation is unreasonable. See Rainsong, 106 F.3d at 272-73 (citing Chevron, 467 U.S. at 844, 104 S. Ct. at 2782-83); accord Association of Pub. Agency Customers, 126 F.3d at 1169 ("When relevant statutes are silent on the salient question, we assume that Congress has implicitly left a void for an agency to fill. We must therefore defer to the agency's construction of its governing statutes, unless that construction is unreasonable."). Applying these principles here, we must determine whether the Commission's decision to employ an existing project baseline fills the interstices of the FPA in a permissible fashion. The Commission concluded in the Order on Rehearing that "it is highly doubtful that attempts to ascertain the status of various resources prior to the time a 50-year-old project was constructed would result in the development of any useful information." 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,327 (citations omitted). We believe that this conclusion furnishes a reasonable interpretation of the FPA. It defies common sense and notions of pragmatism to require the Commission or license applicants to "gather information to recreate a 50-year-old environmental base upon which to make present day development decisions." 54 Fed. Reg. at 23776. The past fifty years of development in the McKenzie River Valley has reconfigured its environmental makeup, introducing changes that include differences in land use, water flows, water quality, river geomorphology, fish species composition, and fishery management practices. To the extent a hypothetical pre-project or no-project environment can be recreated, evaluation of such an environment against current conditions at best serves to describe the current cumulative effect on natural resources of these historical changes.[19] Moreover, weagree with the Commission that the adoption of an existing project baseline does not preclude consideration and inclusion of conditions in a license that enhance fish and wildlife resources and reduce negative impacts attributable to a project since its construction. See Order on Reh'g, 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,327 ("[P]ast environmental impacts are relevant in determining what measures are appropriate to protect, mitigate, and enhance natural resources. . . . Enhancement may in many cases constitute a reduction of the negative impacts attributable to the project since its construction."); see also City of Tacoma, Washington, 71 Fed. Energy Reg. Comm'n Rep. (CCH) P 61,381, at 62,492 (June 22, 1995) ("[U]se of existing conditions as the starting point for analysis is reasonable, . . . is not precluded by either the language or legislative history of the FPA, . . . [and] does not preclude us from considering, in appropriate cases, available information concerning resources affected by a project. . . ."). We find it more than reasonable, however, for the Commission to conduct its "evaluation and consideration of the appropriateness of requiring enhancement measures . . . in the context of today's environment and not in the context of the world as it existed 50 years ago." Order on Reh'g, 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,327. Simply stated, nothing in the FPA suggests that the only acceptable future for the McKenzie River basin is a recreation of its past.
 
 
 32
 Nor are we persuaded by any of the petitioners' other challenges to the reasonableness of the Commission's baseline analysis. First, ODFW submits that the FPA implicitly requires a baseline consisting of a no-project minimum instream flow. This argument conflates the baseline issue with a proposed section 10(j) recommendation and must be rejected.[20] As the Commission accurately notes, the FPA does not mandate "that all past damage to fish and wildlife caused by a project . . . be `mitigated' in a relicensing proceeding." 54 Fed. Reg. at 23,792. More significantly, as discussed in greater detail below, the FPA establishes a delicately balanced process by which the Commission decides whether or how to incorporate a given agency recommendation into a license. Requiring the Commission to establish a baseline containing every fish and wildlife recommendation would undermine the Commission's mandate to consider numerous conflicting interests, rendering sections 4(e), 10(a), 10(j), and 18 superfluous. This approach cannot stand. It would place the Commission in an untenable position and require us to adopt an approach violative of the precept that "[s]tatutes should not be construed to make surplusage of any provision." Wilshire Westwood Assocs. v. Atlantic Richfield Corp., 881 F.2d 801, 804 (9th Cir. 1989) (quoting Pettis ex rel. United States v. Morrison-Knudsen Co., 577 F.2d 668, 673 (9th Cir. 1978)).
 
 
 33
 The petitioners premise their final argument upon a novel reading of our decision in Confederated Tribes and Bands of the Yakima Indian Nation v. Federal Energy Regulatory Comm'n, 746 F.2d 466 (9th Cir. 1984). This Court has held that, in the context of an original FPA hydropower licensing, "once a project begins, the `pre-project environment' becomes a thing of the past. Evaluating the project's effect on preproject resources is simply impossible." LaFlamme v. Federal Energy Regulatory Comm'n, 852 F.2d 389, 400 (9th Cir. 1988). The petitioners, however, contend that Yakima compels a different result when the Commission considers a relicensing proposal. The petitioners' reliance on Yakima is misplaced.
 
 
 34
 Yakima presented the questions of whether the Commission violated the FPA or NEPA either when it bypassed the preparation of an environmental impact statement or when it deferred consideration of fishery protection until after it relicensed the hydropower project. See 746 F.2d at 470-75. In Yakima, we resolved both questions against the Commission, holding that the Commission must consider the environmental impacts of relicensing before issuing a new license. See id. at 475-77. In the Order on Rehearing, the Commission noted that it repeatedly has addressed the confluence between the Yakima opinion and the baseline issue. See 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,326-27. Indeed, as early as 1989, in its regulations implementing the relicensing provisions of the ECPA, the Commission observed that:
 
 
 35
 [W]hile Yakima clearly requires the Commission to evaluate resource impacts prior to licensing, the Commission sees nothing in that decision that requires it either to pretend that current projects do not exist, or to require applicants to gather information to recreate a 50-year old environmental base upon which to make present day development decisions.
 
 
 36
 54 Fed. Reg. at 23776.
 
 
 37
 We agree with the Commission's sensible application of Yakima, and the petitioners have cited no authority to suggest a contrary reading. Indeed, no such authority exists. Our conclusion is consistent with the opinion of the District of Columbia Circuit in United States Department of Interior v. Federal Energy Regulatory Commission in which the court described the limited reach of our decision in Yakima, stating:
 
 
 38
 Yakima at most imposes on the Commission the duty to consider and study the environmental issue before granting a license. . . . Yakima simply endorses the unstartling principles that an agency must establish a record to support its decisions and that a reviewing court, without substituting its own judgment, must be certain that the agency has considered all factors required by the statute.
 
 
 39
 952 F.2d 538, 546 (D.C. Cir. 1992).
 
 
 40
 Accordingly, because the Commission's construction of the FPA offends neither the Chevron reasonableness standard nor the intent of Congress, we defer to the Commission's decision to use an existing project environmental baseline.
 
 B. The NEPA Alternatives
 
 41
 Having upheld the reasonableness of the Commission's baseline, we set aside our Chevron lens and turn to the rule of reason to determine whether the Commission faithfully discharged its duties under NEPA when it evaluated alternatives to the EWEB proposal. The petitioners contend that the Commission erred when it endorsed its staff's identification of the "no-action" alternative in the final environmental impact statement as the continued operation of the Leaburg and Walterville developments under the terms of their original licenses. The petitioners assert that the proper "no-action" alternative under NEPA instead should have been the alternative of not issuing a license at all. Alternatively, the petitioners contend that the Commission violated NEPA because the range of alternatives examined by the Commission did not include license denial and subsequent project decommissioning and dam removal. These contentions fail. As discussed below, the Commission's identification and evaluation of alternatives satisfied NEPA's procedural requirements.
 
 
 42
 Under NEPA, an environmental impact statement must include "the alternative of no action." 40 C.F.R. S 1502.14(a) (1998); Association of Pub. Agency Customers, Inc., 126 F.3d at 1188. An environmental impact statement also must discuss "reasonable alternatives" to the proposed agency action. 42 U.S.C. S 4332(2)(C)(iii); Alaska Wilderness Recreation and Tourism Ass'n, 67 F.3d at 729 (quoting 40 C.F.R.S 1502.14) (explaining that consideration of alternatives "is the heart of the environmental impact statement"). The rule of reason guides "both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative." City of Carmel-By-The-Sea v. United States Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997) (citations omitted). Under the rule of reason, the Commission "need not consider an infinite range of alternatives, only reasonable or feasible ones." Id. (citing 40 C.F.R. S 1502.14 (a)(c)). "[F]or alternatives which were eliminated from detailed study, [the environmental impact statement must] briefly discuss the reasons for their having been eliminated." 40 C.F.R. S 1502.14(a)(emphasis added).
 
 
 43
 In the Order on Rehearing the Commission acknowledged that "[i]n the relicensing context, defining a logical `no action' alternative is difficult, because the Commission is legally required to take some action on the application for a new license, pursuant to Section 15 of the FPA." 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,326 (quoting Public Serv. Co. of New Hampshire, 68 Fed. Energy Reg. Comm'n Rep. (CCH) P 61,177, at 61,866-67 (Aug. 1, 1994)). We conclude that the statutory scheme sustains the Commission's no action definition and betrays the predominantly semantic nature of this dispute. As the Commission explained, by operation of FPA section 15(a), the effect of the Commission's taking "no action" on EWEB's relicensing application would have been to permit EWEB to continue operating the project indefinitely subject to the terms and conditions of its expired original license. See id. Section 15(a) authorizes the Commission to impose upon the relicensed party "such terms and conditions as may be authorized or required under the then existing laws and regulations." 16 U.S.C. S 808(a)(1). The Commission also may issue a "non-power license" if the public interest requires that "all or part of any licensed project should no longer be used . . . for power purposes." 16 U.S.C. S 808(f); see 18 C.F.R. S 16.11 (1998). Here, the Commission logically questioned "whether license denial could appropriately be considered `no action' in the case of a relicensing . . . . [as d]enial would require action, rather than inaction, and would presumably be coupled with other proposed actions, such as federal takeover, issuance of a nonpower license, or project decommissioning." Order on Reh'g, 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,326 (quoting Public Serv. Co. of New Hampshire, 68 Fed. Energy Reg. Comm'n Rep. (CCH) at 61,866-67); see also Edwards Mfg. Co., 81 Fed. Energy Reg. Comm'n Rep. (CCH) P 61,255 (Nov. 25, 1997) (explaining that the decision to deny relicensing and to require dam removal constitutes a major federal action). In view of this regime, the Commission logically concluded that the "definition of the no action alternative as continued operation of the project under the same terms and conditions as the existing license simply reflects this statutory reality." Order on Reh'g, 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,326 (quoting Public Serv. Co. of New Hampshire, 68 Fed. Energy Reg. Comm'n Rep. (CCH) at 61,867).
 
 
 44
 The Commission's choice of the terms of the original license as the no action alternative finds additional support from the Council on Environmental Quality's ("CEQ") response to Question No. 3 of its NEPA guidance memorandum.[21] The response states, in pertinent part:
 
 
 45
 [W]here ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed . . . . "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed.
 
 
 46
 Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (1981). We recognize that the relicensing process does not fit perfectly under the model of updating a land management plan as contemplated in the response to Question 3. Nevertheless, this Court has employed this regulatory language under analogous circumstances, see Association of Pub. Agency Customers, 126 F.3d at 1188 (holding that "CEQ regulations allow the status quo [of continuing power sales contracts] to properly be the no action alternative."), and we find nothing in the regulation to preclude its application in the hydropower relicensing context. In light of the scheme established by FPA section 15 and our decision in Association of Public Agency Customers, we conclude that the Commission properly identified the no action alternative.
 
 
 47
 We similarly reject the petitioners' contention that the Commission did not adequately examine the alternative of license denial. In the Order on Rehearing, the Commission explicitly stated that "license denial and dam removal will in most proceedings not be considered a reasonable alternative by anyone." 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,327; see Final Environmental Impact Statement, SS 2.5, 2.7, at 2-9 to 2-11. The Commission noted that "[d]ams, and the reservoirs they create, usually serve a variety of nonpower public purposes, such as flood control, irrigation, and recreation. Moreover, . . . removing a dam can have significant adverse environmental impacts." Id. at n.13.
 
 
 48
 Here, the final environmental impact statement clearly considered the alternatives urged by the petitioners. Although the Commission never engaged in a lengthy evaluation of the dam removal alternative at any stage of the administrative process, its analysis comfortably meets the "discuss briefly" standard of 40 C.F.R. S 1502.14(a) and the rule of reason employed by this Court. In sum, we are satisfied that the Commission has taken a hard look at the range of licensing alternatives and complied with its procedural obligations under NEPA.
 
 IV
 
 49
 We come to our final interpretive task. Once more, the petitioners challenge the Commission's construction of the FPA, raising two questions under related, but markedly different, statutory sections. These challenges again engender de novo review and require two distinct iterations of the Chevron standard. First, we consider whether the FPA authorizes the Commission to decide that a fish and wildlife agency recommendation submitted pursuant to section 10(j) does not qualify for treatment under that section.[22] Second, we examine whether the Commission may reject a "fish way prescription" proposed by the Secretary of Commerce or the Secretary of Interior under FPA section 18. These are not inconsequential questions. Both questions present this Court with issues of first impression in our Circuit, and both beget answers bearing significantly on the hydropower relicensing process.
 
 A. Section 10(j)
 
 50
 As previously explained, the FPA establishes an elaborate regulatory regime which charges the Commission with responsibility to balance the interests of hydropower licensees and other participants in the licensing process. The processes required by section 10(j) represent a vital part of that regime. Subsection 10(j)(1), as amended by the ECPA, instructs:
 
 
 51
 (1) That in order to adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife (including related spawning grounds and habitat) affected by the development, operation, and management of the project, each license issued under this subchapter shall include conditions for such protec tion, mitigation, and enhancement. Subject to paragraph (2), such conditions shall be based on recommendations received pursuant to the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.) from the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies.
 
 
 52
 16 U.S.C. S 803(j)(1). Subsection 10(j)(2), however, specifies that the Commission should attempt to reconcile agency recommendations with the requirements of the FPA. See 16 U.S.C. S 803(j)(2). If, after giving due weight to these recommendations, the Commission does not adopt them, in whole or in part, the statute requires the Commission to publish the following findings (with a basis for each of the findings):
 
 
 53
 (A) A finding that adoption of such recommendation is inconsistent with the purposes and requirements of this subchapter or with other applicable provisions of law.
 
 
 54
 (B) A finding that the conditions selected by the Commission [protect and mitigate damage to fish and wildlife].
 
 
 55
 Id.
 
 
 56
 Here, our Chevron analysis begins and ends with the statute itself. We detect in section 10(j) the type of clear congressional mandate that suffices to curtail a Chevron query at step one. We are not the first court to do so. In National Wildlife Federation v. Federal Energy Regulatory Commission, 912 F.2d 1471 (D.C. Cir. 1990), the District of Columbia Circuit affirmed a Commission order which had rejected agency recommendations submitted as section 10(j) conditions. Although these recommendations concerned a proposal not properly before the Commission, the court nonetheless concluded that:
 
 
 57
 [W]hile the Commission must pay due regard to such recommendations,[section 10(j)] cannot be read to force upon the Commission the burden of strict acceptance of each and every proper recommendation. While the Commission must address each recommendation, the discretion ultimately vests in the Commission as to how to incorporate each recommendation.
 
 
 58
 Id. at 1480; see also California exrel. State Water Resources Control Bd. v. Federal Energy Regulatory Comm'n, 966 F.2d 1541, 1550 (9th Cir. 1991) (noting that the ECPA amendments require the Commission "to demonstrate why conditions proposed by fish and wildlife agencies should not be included in a license").
 
 
 59
 The petitioners cite Kelley v. Federal Energy Regulatory Commission, 96 F.3d 1482, 1487 (D.C. Cir. 1996), for the proposition that the District of Columbia Circuit since has acknowledged that the reclassification issue remains an open question. In Kelley, the Michigan Department of Natural Resources ("Michigan") challenged the Commission's refusal to require license conditions that Michigan sought under section 10(j). The Director had reclassified Michigan's objections and considered them under the more permissive standards of FPA sections 4(e) and 10(a). The full Commission affirmed the Director on rehearing. At both administrative stages, the Commission failed to explain its actions through published findings as required by subsection 10(j)(2). On appeal, the court acknowledged:
 
 
 60
 [T]he question whether the Commission legitimately treated Michigan's recommendations as falling out side of S 10(j) and therefore not entitled to the deference that section carries nor requiring the specific finding FERC must make before rejecting such recommendations (that they are "inconsistent with the purposes and requirements" of the Act or other provisions of law) is a weighty one.
 
 
 61
 Id. (emphasis added). Although Michigan's failure to preserve the issue precluded the Kelley court from resolving the question, this passage crystallizes the factual distinctions between Kelley and the District of Columbia Circuit's previous decision in National Wildlife Federation. In Kelley, the Commission left an opaque record. See id. Conversely, the administrative record in National Wildlife Federation plainly provided the reasons for the Commission's rejection and reclassification of the agency submissions. See 912 F.2d at 1480.
 
 
 62
 In our view, Kelley in no way abrogates the holding in National Wildlife Federation. Kelley at most indicates that the District of Columbia Circuit has not yet determined whether the Commission can avoid its obligation under subsection 10(j)(2) to publish its findings before rejecting agency recommendations. Although the procedural posture of Kelley abbreviated the court's inquiry, nothing left unanswered in Kelley dissuades us from adopting the sound reasoning in United States Department of Interior which withholds from the agencies a "veto power" over the section 10(j) process.[23] See 952 F.2d at 545.
 
 
 63
 The petitioners next contend that endowing the Commission with authority to reject and reclassify agency conditions would contravene the language found in the mandatory clause of subsection 10(j)(1). In support of this contention, the petitioners invoke the rule articulated by the Supreme Court in Escondido Mut. Water Co. v. La Jolla Bands of Mission Indians, 466 U.S. 765, 104 S. Ct. 2105, 80 L. Ed. 2d 753 (1984). At issue in Escondido was the pre-license certification scheme of FPA section 4(e) which permits the Secretary of the Interior to impose certain requirements on licenses issued within any Native American reservation. See 16 U.S.C. S 797(e).[24] The Commission had refused to accept the Secretary's conditions, and an aggrieved party sought review. The Supreme Court focused closely on the plain language of section 4(e) and agreed with the petitioners that "[t]he mandatory nature of the language chosen by Congress appears to require that the Commission include the Secretary's conditions in the license even if it disagrees with them." Escondido, 466 U.S. at 772, 104 S. Ct. at 2110.
 
 
 64
 Although Escondido proves dispositive in the section 18 context,[25] it is not a fair congener here because of the distinguishing features of the relevant statutory provisions. Section 10(j) and section 4(e), the provision at issue in Escondido, set forth very different roles for the Commission to play in the hydropower licensing process. Congress provided in subsection 10(j)(2) a mechanism for the Commission to employ when it disagrees with a submitted agency condition, unlike the pre-license certification scheme Congress set forth in FPA section 4(e). That mechanism, the publication of findings, clearly qualifies the mandatory clause of subsection 10(j)(1) and is expressly contemplated in the phrase "[s]ubject to paragraph (2)" that prefaces the mandatory language. The ordinary meaning of "subject to" includes "governed or affected by." Black's Law Dictionary 1425 (6th ed. 1990); see also Sutherland Stat. Const. S 47.28 at 248 (5th ed. 1992) (explaining that "when common terms are used they should be given their common meaning" and that "approved usage of words can be established by the definition of a recognized dictionary"). We therefore interpret "subject to paragraph (2)" to mean precisely what it says: subsection 10(j)(1) is governed or affected by subsection 10(j)(2). Moreover, were we to read subsection 10(j)(1) as conferring final authority over the section 10(j) process upon the resource agencies, we impermissibly would be making surplusage of subsection 10(j)(2). See Wilshire Westwood Assocs., 881 F.2d at 804. Such a reading would contravene the principle that "a statute must be interpreted to give significance to all of its parts." Glickman, 82 F.3d at 833-34 (citing Boise Cascade Corp. v. EPA, 942 F.2d 1427, 1432 (9th Cir. 1991)). In sum, the divergent structures of S 10(j) and S 4(e), the plain meaning of the prefatory phrase "subject to," and the abecedarian principle of giving effect to every subsection convince us that Escondido is inapposite here.
 
 
 65
 Perhaps anticipating this conclusion, the petitioners nevertheless urge that the legislative history of the ECPA amendments to the FPA cast doubt on the Commission's section 10(j) reclassification authority. We briefly essay the legislative history because the parties emphasize its importance and because we "look to legislative history in order to determine whether there is a clear indication of contrary intent." Coronado-Durazo v. INS, 123 F.3d 1322, 1325 (9th Cir. 1997) (citation omitted). In so doing, we are mindful that this Court steadfastly abides by the principle that "legislative history -no matter how clear -can't override statutory text." Hearn v. Western Conference of Teamsters Pension Trust Fund, 68 F.3d 301, 304 (9th Cir. 1995) (citations omitted).
 
 
 66
 Here, we find that the legislative history accompanying section 10(j) mirrors the plain language of subsection 10(j)(2) and reconfirms that Congress intended to vest the Commission with ultimate authority to reject agency recommendations improperly lodged under section 10(j). The conference report accompanying the ECPA clearly instructs the Commission to give "the same careful and thoughtful consideration to fish and wildlife values that it gives to other purposes." H.R. Conf. Rep. No. 99-934, at 25, reprinted in 1986 U.S.C.C.A.N. 2537, 2541. The report also states, in pertinent part:
 
 
 67
 [W]hile new section 10(j) certainly upgrades statutorily the importance and status of fish and wildlife recommendations under the Fish and Wildlife Coordination Act, they are still recognized as "recommendations," not mandatory requirements . . . . [T]he conferees emphasize that the amendments do not dictate a particular result nor predetermine FERC's ultimate judgment concerning the public interest . . . .
 
 
 68
 Id. (emphasis added). The conferees addressed the scope of the decisional authority vested in the Commission and declared that although agency recommendations "cannot be lightly dismissed," the Commission "is not required to adopt recommendations that are inconsistent with any other purpose of the Federal Power Act as expressed in section 4(e)." Id. at 23, reprinted in 1986 U.S.C.C.A.N. at 2540. Although we believe that the language of section 10(j), standing alone, clearly supports the Commission's actions, thesepassages from the Conference Report silence any remaining doubts concerning congressional intent. See Glickman, 82 F.3d at 835 ("[A] congressional conference report is recognized as the most reliable evidence of congressional intent because it `represents the final statement of the terms agreed to by both houses.' ") (quoting Department of Health & Welfare v. Block, 784 F.2d 895, 901 (9th Cir. 1986)).
 
 
 69
 Given the persuasive reasoning of our sister circuit, our own interpretation of section 10(j), and the legislative history contained in the ECPA amendments, we put an end to our penultimate Chevron inquiry. Because we conclude that the statute is susceptible to only one interpretation, we reject the position advanced by the petitioners. In denying the petitions insofar as they challenge the Commission's understanding of its statutory mandate under section 10(j), our holding is narrow. We conclude that section 10(j) clearly vests in the Commission the discretion as to how or whether it will incorporate a section 10(j) recommendation received from a listed agency. As noted above, we express no opinion on the merits of the Commission's environmental findings. Moreover, we stress that nothing we have said should be construed as eviscerating the pro-environmental object beneath the ECPA amendments. The Commission must afford "significant deference to recommendations made by state (and federal) fish and wildlife agencies for the `protection, mitigation, and enhancement' of fish and wildlife." Kelley, 96 F.3d at 1486 (emphasis added). Nevertheless, Congress clearly has ordained that this deference must yield to the Commission's reasoned judgment in those instances where the parties cannot agree. Under Chevron, "that is the end of the matter." 467 U.S. at 842, 104 S. Ct. at 2781.
 
 B. Section 18
 
 70
 We are met at the outset with two jurisdictional arguments from the Commission. First, the Commission contends that the petitioners lack standing to challenge the section 18 determinations. The Commission maintains that petitioners may not independently challenge the Commission's actions because only the federal intervenors, not petitioners, have rights under that section. Alternatively, the Commission contends that the petitioners' collective challenges to the section 18 rulings are not ripe for our review because the Commission's orders have left unresolved final action on many section 18 issues. These contentions have no merit.
 
 
 71
 The petitioners clearly have standing. We again borrow the District of Columbia Circuit's reasoning in United States Department of Interior, a case with a virtually identical procedural posture. See 952 F.2d at 544 n.4. There, the court held that state agencies had parens patriae standing and the environmental organizations had organizational standing to challenge "FERC's balancing under sections 4(e) and 10(a)." Id. The court concluded that the Commission's standing arguments had no merit because the state agencies and environmental organizations made "identical substantive challenges." Id. The court rested its conclusion on the parens patriae standing of the state agencies and the organizational standing of the environmental organizations. See id.
 
 
 72
 Here, in both the administrative proceedings and in this litigation, the Departments of Commerce and Interior, American Rivers, and ODFW all urged that section 18 requires the Commission to adopt the federal agencies' fishway prescriptions without modification. ODFW has parens patriae standing. See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 600-07, 102 S. Ct. 3260, 3265-69, 73 L. Ed. 2d 995 (1982). American Rivers has organizational standing. See Sierra Club v. Morton, 405 U.S. 727, 739, 92 S. Ct. 1361, 1368, 31 L. Ed. 636 (1972). Accordingly, the petitioners have standing to challenge the Commission's section 18 rulings.
 
 
 73
 The Commission next argues that the disputed fishways prescriptions are not ripe for our review because the new license contains open-ended planning provisions under which EWEB will submit "final design plans" to the Commission in consultation with the federal resource agencies. See Order Issuing New License, 78 Fed. Energy Reg. Comm'n Rep. (CCH) at 64,710-714 (implementing articles 410, 416, and 420). The Commission reasons that "because EWEB may, after consulting with the federal agencies, ultimately develop plans that honor in full each of the detailed specifications for fish ladders and fish screens previously submitted by the agencies, and because the Commission may ultimately approve those plans, the orders under review cannot be considered ripe." Federal Energy Regulatory Comm'n Br. at 6364. We disagree.
 
 
 74
 In Steamboaters v. Federal Energy Regulatory Commission, this Court held that a Commission order "is certainly final insofar as it definitively resolves the issue whether [agency-prescribed] conditions are mandatory." 759 F.2d 1382, 1388 (9th Cir. 1985). Here, the Commission's disputed arrogation of section 18 authority turns on a discrete issue of law: whether the Commission properly may reject or reclassify fishway prescriptions submitted by the petitioners. "It is difficult to postulate an issue more proper for judicial decision than that of the statutory authority of an administrative agency." State Water Resources Control Bd., 966 F.2d at 1562. Accordingly, the section 18 issues are ripe. We thus turn to the merits and our last occasion for Chevron analysis.
 
 
 75
 We begin with the critical asymmetry in sections 18 and 10(j). Section 18 directs that the Commission "shall require the construction, maintenance, and operation by a licensee at its own expense of . . . such fishways as may be prescribed by the Secretary of the Interior or the Secretary of Commerce, as appropriate." 16 U.S.C. S 811. Conspicuously absent from this provision is a qualifying clause, such as the one in FPA subsection 10(j)(2), which expressly enables the Commission to reject a recommendation submitted under color of section 10(j). Ignoring this structural distinction, the Commission argues that we must not disturb its section 18 "findings" because the Commission fully explained on the record its reasons for rejecting the fishway prescriptions. This argument misses the mark. Section 18 on its face simply does not contemplate the two-pronged approach set forth in subsection 10(j)(2). Although the presence of a qualifying clause in subsection 10(j)(2) does not foreclose the Commission's professed authority to reject fishways prescribed by either the Secretary of Interior or Secretary of Commerce, the absence of a similar provision in section 18 suggests more than mere legislative oversight. Clearly, if Congress had wanted findings under section 18, it knew how to ask for them. See Williamson v. Commissioner, 974 F.2d 1525, 1532 (9th Cir. 1992).
 
 
 76
 Taking a different tack, the Commission cautions that its statutory mission would be compromised if it were left without authority to determine whether a submission prescribes a fishway or instead constitutes a recommendation more appropriately evaluated under FPA sections 10(j) or 10(a). See generally California v. Federal Energy Regulatory Comm'n, 495 U.S. 490, 496, 110 S. Ct. 2024, 2028, 109 L. Ed. 2d 474 (1990) (recognizing that the FPA represents a congressional intention to establish "a broad federal role in the development and licensing of hydroelectric power"). This argument strikes a familiar chord, for it has been rejected by every court that has considered the supposed tension between the Commission's role in the FPA relicensing process and various statutory delegations of authority to outside agencies.
 
 
 77
 In Escondido, the seminal case on this score, the Supreme Court acknowledged that FPA section 10(a) grants the Commission ultimate authority and responsibility to ensure that hydropower projects will be "best adapted" to serve a multitude of conflicting interests. See Escondido, 466 U.S. at 778 n.21, 104 S. Ct. at 2113 n.21.The Court, however, found no conflict between the Commission's section 10(a) authority and the land-administering departments' power to impose conditions under section 4(e). See id. Rather, the Court squarely addressed the petitioners' argument that requiring the Commission to include the Secretary's section 4(e) conditions would undermine its statutory mandate, stating:
 
 
 78
 This argument is unpersuasive because it assumes the very question to be decided. . . . The real ques tion is whether the Commission is empowered to decide when the Secretary's conditions exceed the permissible limits. Petitioners' argument assumes that the Commission has the authority to make that decision. However, the statutory language and the legislative history conclusively indicate that it does not; the Commission "shall" include in the license the conditions the Secretary deems necessary.
 
 
 79
 Id. at 777, 104 S. Ct. 2112-13. No lower court has declined to follow this aspect of the Supreme Court's decision in Escondido, and other circuits have extended the holding to other statutory provisions. See American Rivers, Inc. v. Federal Energy Regulatory Comm'n, 129 F.3d 99, 109-10 (2d Cir. 1997) (applying Escondido's reasoning to section 401 of the Clean Water Act, 33 U.S.C. S 1341); Southern California Edison Co. v. Federal Energy Regulatory Comm'n, 116 F.3d 507, 512-13 (D.C. Cir. 1997) (reaffirming the vitality of this aspect of Escondido in light of the ECPA amendments); Keating v. Federal Energy Regulatory Comm'n, 114 F.3d 1265, 1269-71 (D.C. Cir. 1997) (same). Like these tribunals, we reject the Commission's vision of its absolute role in relicensing. Instead, we divine in the FPA a clear congressional delegation of the section 18 process to the Secretaries, exactly the sort of statutory directive that counsels a one-step Chevron inquiry.
 
 
 80
 The Commission counters by conceding that section 18, like section 4(e), reserves for the Secretaries a measure of authority to prescribe certain conditions into a hydropower license. Indeed, the Commission previously has concluded that it cannot reject, reclassify, or otherwise challenge a properly prescribed section 18 fishway. See Lynchburg Hydro Assocs., 39 Fed. Energy Reg. Comm'n Rep. (CCH)P 61,079, at 61,218 (Apr. 29, 1987) ("Section 18 is mandatory and . . . we must therefore require the licensee to construct, operate, and maintain fishways that the Secretary of the Interior or the Secretary of Commerce may prescribe. We have no discretionary authority in this regard; fishways must be required when properly prescribed by the Secretaries.") (emphasis added); accord Bangor Hydro-Electric Co. v. Federal Energy Regulatory Comm'n, 78 F.3d 659, 662 n.2 (D.C. Cir. 1996). Here, however, the Commission attempts to distinguish Escondido, insisting that its reasoning does not apply when what the Secretaries prescribe does not constitute a fishway.
 
 
 81
 The Commission's efforts to distinguish Escondido cannot withstand scrutiny. The Commission first relies on a portion of Escondido that does not bear on this case. The Escondido Court, in addition to its conclusion that the Commission cannot reject conditions imposed by the Secretary of Interior under section 4(e), also held that the FPA did not require the Commission to incorporate into its license several of the Secretary's conditions which applied to Native American reservations. None of the licensed facilities were located on these reservations. The Court concluded that these conditions would contravene section 4(e)'s mandate that Commission licenses issued to projects "within any reservation" shall include conditions for the "adequate protection and utilization of such reservation." Escondido, 466 U.S. at 780-81, 104 S. Ct. at 2114.
 
 
 82
 In rejecting the very same argument now forwarded by the Commission, the Second Circuit stated that "[t]his rather unremarkable [aspect of Escondido] does not support the Commission's contention that it may review and reject any state-imposed condition that it finds to beviolative of S 401 [of the Clean Water Act]." American Rivers, 129 F.3d at 110. Indeed, this prong of the Escondido holding simply gives effect to the statute's explicit directive enabling the Commission to reject conditions which, on their face, exceed statutorily defined geographic limits on a prescribing agency's jurisdiction. Thus, the Escondido Court's treatment of the reservation clause in section 4(e) is inapposite here.
 
 
 83
 The Commission next relies upon a strained reading of a post-ECPA congressional clarification of the Commission's authority regarding fishways contained in the Energy Policy Act of 1992 (the "Energy Act"), Pub. L. No. 102-486, 106 Stat. 2776 (1992). In the Energy Act, Congress explicitly considered and rejected amendments to section 18 that would have limited the Department of the Interior's authority to prescribe fishways. The Commission had asked Congress for a statutory grant of authority to consider and balance the Department of Interior's recommendations for fishways with other values. See National Energy Strategy: Hearings on H.R. 1301 et al. Before the Subcomm. on Energy & Power of the House Comm. on Energy & Commerce, 102d Cong., 1st Sess. Pt. 6 at 516-17 (1991). Congress rejected this approach. More significantly, Congress overturned the Commission's own rulemaking efforts to define fishway prescriptions. See Pub. L. 102-486, S 1701(b), 106 Stat. 3008 ("S 1701(b)"). The Commission initially had adopted a restrictive definition of fishways that included only facilities "used for the upstream passage of fish" through a hydropower project. 56 Fed. Reg. 23,108, 23,146 (May 20, 1991). In response to public outcry over this definition, the Commission subsequently amended its rule on rehearing to embrace both upstream and downstream passage. See 56 Fed. Reg. 61,137, 61,140-45 (Dec. 2, 1991) (previously codified at 18 C.F.R. S 4.30(b)(9)(iii) (1992)). Congress promptly rejected and overturned the amended regulatory definition as still too narrow, providing:
 
 
 84
 The definition of the term `fishway' contained in 18 C.F.R. 4.30(b)(9)(iii), as in effect on the date of enactment of this Act [Oct. 24, 1992], is vacated without prejudice to any definition or interpretation by rule of the term `fishway' by the Federal Energy Regulatory Commission for purposes of implementing section 18 of the Federal Power Act. Provided, that any future definition promulgated by regulatory rulemaking shall have no force or effect unless con curred in by the Secretary of the Interior and the Sec retary of Commerce: Provided further, That the items which may constitute a `fishway' under section 18 for the safe and timely upstream and down stream passage of fish shall be limited to physical structures, facilities, or devices necessary to maintain all life stages of such fish, and project operations and measures related to such structures, facilities, or devices which are necessary to ensure the effective ness of such structures, facilities, or devices for such fish.
 
 
 85
 S 1701(b) (emphasis in original).
 
 
 86
 Despite this explicit rejection of the Commission's proposed fishways definitions, the Commission seizes upon a perceived ambiguity in the limiting clause at the end of S 1701(b) which sets forth the items which may constitute a fishway. The Commission argues that this final clause does not specify which agency is to determine whether a given prescription "constitutes a fishway under section 18." In light of this omission, the Commission, EWEB, and industry amici extensively cite the legislative history, attempting to educe from the record some indicia of support for their position. As we have explained, we canvas legislative records cautiously, for their use "as a tool for statutory interpretation suffers from a host of infirmities." Leisnoi, Inc. v. Stratman, 154 F.3d 1062, 1070 (9th Cir. 1998). Distilling this morass of materials, we address only those portions of the legislative history that the Commission, industry amici, and EWEB have emphasized most strenuously.
 
 
 87
 First, EWEB and the industry amici proffer comments attributed to a senator responding to perceived erroneous statements made by several members of the House of Representatives regarding the effect of S 1701(b). In offering his own post-hoc interpretation of the intent behind the amendment, the senator stated:
 
 
 88
 [T]his language allows FERC to proceed on a case by-case basis. . . . I would note that FERC must be able to make the distinction between [section 18] fishway facilities and other project facilities. Other wise a fishway agency would be able to exercise unbridled authority over projects, to the exclusion of any FERC control over the projects. . . .
 
 
 89
 138 Cong. Rec. S17566, S17623-24 (daily ed. Oct. 8, 1992) (statement of Senator Wallop). We accord this remark no interpretive weight. See Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S. Ct. 1562, 1567, 123 L. Ed. 2d 229 (1993) (Scalia, J., concurring) ("We are governed by laws, not by the intentions of legislators."); Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S. Ct. 1705, 1722, 60 L. Ed. 2d 208 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."); Thompson v. Calderon, 151 F.3d 918, 928-29 (9th Cir.) (en banc) (Kleinfeld, J., concurring) ("[I]ndividual senators do not make laws; majorities of the House and Senate do.") (citation omitted), cert. denied, 119 S. Ct. 3 (1998).[26]
 
 
 90
 Turning to other historical sources, the Commission offers this excerpt from the conference report to the Energy Act which stated that S 1701(b):
 
 
 91
 does not affect the authority of the Commission to continue to issue license orders that could include fishway prescriptions under section 18. In essence, the provision returns the Commission and the Secre taries to the position they were in under section 18 of the Federal Power Act prior to the [sic] FERC adopting by regulation the fishway definition.
 
 
 92
 H.R. Conf. Rep. No. 102-1018, at 393, reprinted in 1992 U.S.C.C.A.N. 2472, 2484. The Commission has inferred from this passage that because Congress did not explicitly overrule the Commission's decision in Lynchburg,S 1701(b) "does not reflect a Congressional intent to invalidate pre-rule commission case law regarding Section 18." 81 Fed. Energy Reg. Comm'n Rep. (CCH) at 62,334 n.50 (citing Niagara Mohawk Power Corp., 67 Fed. Energy Reg. Comm'n Rep. (CCH) P 61,300, at 62,038 (June 3, 1994)). From this inference, the Commission has seen fit to expand upon the Lynchburg holding and, in the process, free itself from the shackles of Escondido. Our review of the FERC Reports reveals that the Commission has developed an extensive body of cases which consistently have held that the Commission may reject and reclassify "improperly prescribed" section 18 fishways. See, e.g., Wisconsin Pub. Serv. Corp., 82 Fed. Energy Reg. Comm'n Rep. (CCH) P 61,271, at 62,064 (Mar. 16, 1998); Western Massachusetts Elec. Co., 79 Fed. Energy Reg. Comm'n Rep. (CCH) P 61,007, at 61,050-51 (Apr. 4, 1997); Niagara Mohawk, 67 Fed. Energy Reg. Comm'n Rep. at 62,038-39; City of LeClaire, Iowa, 66 Fed. Energy Reg. Comm'n Rep. P 61,270, at 61,663-64 (Mar. 1, 1994).
 
 
 93
 The Commission has gone too far. The Energy Act conference report simply cannot support the interpretive weight that the Commission places upon it. The report clearly stated that the roles of the Commission and the Secretaries of Interior and Commerce "would continue to be as[they were] prior to [the passage of S 1701]. Nothing in this amendment is intended to limit the roles or authorities of either the Secretaries or the Commission." H.R. Conf. Rep. No. 102-1018, at 393, reprinted in 1992 U.S.C.C.A.N. at 2484. As noted above, prior to the passage of S 1701(b), Escondido delineated the respective roles of the Secretaries and the Commission under the statute. In other words, no matter how selectively the Commission quotes the legislative record and no matter how many inferential deductions it makes, there is no escaping the simple fact that Escondido has set forth the analytic framework which authoritatively animates the statutory scheme, both then and now. As the Court explained:
 
 
 94
 The ultimate decision whether to issue the license belongs to the Commission, but the Secretary's proposed conditions must be included if the license issues. Any conflict between the Commission and the Secretary with respect to whether the conditions are consistent with the statute must be resolved ini tially by the courts of appeals, not the Commission.
 
 
 95
 Id. at 778 n.21; 104 S. Ct. at 2113 n.21; see also Wisconsin Pub. Serv. Corp. v. Federal Energy Regulatory Comm'n, 32 F.3d 1165, 1170-71 (7th Cir. 1994) ("Congress has delegated to the Secretary of the Interior the authority to make a determination when and if a [section 18] fishway may become necessary."). The District of Columbia Circuit specifically has applied this framework in the section 18 context, holding that "[u]nder [section 18], FERC performs primarily as a neutral forum responsible for compiling the record for the benefit of the court of appeals. It may subsequently on review take a position or not as it wishes." Bangor Hydro, 78 F.3d at 663. We, too, find Escondido controlling in the section 18 context and therefore hold that the Commission may not modify, reject, or reclassify any prescriptions submitted by the Secretaries under color of section 18. Where the Commission disagrees with the scope of a fishway prescription, it may withhold a license altogether or voice its concerns in the court of appeals, but at the administrative stages, "it is not the Commission's role to judge the validity of [the Secretary's] position--substantially or procedurally." Id.
 
 
 96
 We note the Commission's argument that an unqualified reservation of prescription authority for the Secretaries invites a unilateral fishways determination by two agencies which do not concern themselves with the delicate economic versus environmental balancing required in every licensing. We acknowledge, as pointed out by the Commission, that the prescribing federal agencies have not promulgated regulations to guide license applicants and others in utilizing this section of the law. See Hydroelectric Relicensing Procedures: Oversight Hearing Before the Subcomm. on Water and Power of the Senate Comm. on Energy and Natural Resources, 105th Cong. 8 (1997) (testimony of Jerry L. Sabattis, Hydro Licensing Coordinator, Niagara Mohawk Power Corp.) ("Interior has never developed any regulations, procedures or standards for implementing Section 18 and has no internal appeal procedures for dealing with disputes which may arise."); 138 Cong. Rec. H11427-01 (daily ed. Oct. 5, 1992) (statement of Rep. Dingell) ("[I]t is somewhat disturbing that after so many years that [sic] the fishery agencies themselves have not prescribed regulations on their own initiative."). Nevertheless, Congress was acutely aware of the Secretaries' omission when it passed S 1701 and "[t]here is nothing in the statute or the review scheme to indicate that Congress wanted the Commission to second-guess the Secretary . . . ." Escondido, 466 U.S. at 77879, 104 S. Ct. at 2113. That we might disagree with Congressional failure to require such regulations, however, does not authorize us to rewrite section 18. "Our task is to apply the statute's text, not to improve upon it." Williamson, 974 F.2d at 1533 (citing Pavelic & LeFlorev. Marvel Entertainment Group, 493 U.S. 120, 126, 110 S. Ct. 456, 460, 107 L. Ed. 2d 438 (1989)); see also Badaracco v. Commissioner, 464 U.S. 386, 398, 104 S. Ct. 756, 764, 78 L. Ed. 2d 549 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement.").
 
 V
 
 97
 In the end, analysis of the application is quite simple. We deny the petitions insofar as they challenge the Commission's FPA baseline analysis, its compliance with NEPA, and FERC's authority to reclassify, reject, or modify section 10(j) recommendations. Nevertheless, in light of the statutory scheme, its legislative history, and the precedent which binds this Court, we grant the petitions to the extent they challenge the Commission's construction of section 18. Accordingly, we vacate the Order Issuing New License and the Order on Rehearing and remand the case to the Commission.
 
 
 98
 PETITION GRANTED IN PART, DENIED IN PART, VACATED, AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The environmental organizations consist of American Rivers, Pacific Rivers Council, Oregon Natural Resources Council, WaterWatch of Oregon, and Friends of the Earth. Federal intervenors include the Departments of Commerce and Interior, the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, and the Environmental Protection Agency. In addition, the Skokomish and Nez Perce Indian Tribes have filed amicus curiae briefs. For purposes of this opinion, we sometimes designate the environmental organizations, intervenors, amici, and the Oregon Department of Fish and Wildlife ("ODFW"), collectively, as the "petitioners."
 
 
 [2]
 EWEB intervened in support of the respondent Commission. Industry amici and the City of Tacoma, Washington also have filed briefs in support of the Commission. The industry amici are American Public Power Association, Edison Electric Institute, Industrial Customers of Northwest Utilities, National Hydropower Association, Northwest Hydroelectric Association, Portland General Electric Company, and Public Power Council.
 
 
 [3]
 At the request of EWEB, the Director of the Commission's Office of Hydropower Licensing ("Director") consolidated the two developments into one licensed project known as the Leaburg-Walterville Hydroelectric Project No. 2496. See id.
 
 
 [4]
 When a hydropower license expires, the Commission may issue a new license to the existing or a new licensee or authorize a federal takeover of the project. See 16 U.S.C. S 808(a) (1994). While a federal takeover or new license application is pending, the Commission must issue annual licenses to the existing licensee on the same terms as the original license. See id.; 18 C.F.R. S 16.18(b) (1998).
 
 
 [5]
 The Commission delegated its licensing authority to the Director. See 18 C.F.R. S 375.314(a)(1) (1998).
 
 
 [6]
 Prior to the ECPA amendments, the FPA focused primarily on power concerns at licensing with little mention of the attendant environmental consequences. As originally enacted, section 4(e) directed the Commission to exercise its licensing authority for the "development, transmission, and utilization of power." Federal Power Act, ch. 285, S 4, 41 Stat. 1060, 1065-66 (1920) (codified at 16 U.S.C. S 797(e)). Similarly, the original incarnation of section 10(a) instructed the Commission to develop a comprehensive plan "for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce." Id. at 1068 (codified at 16 U.S.C. S 803(a)). The ECPA amendments added section 10(j), now codified at 16 U.S.C. S 803(j).
 
 
 [7]
 For instance, the license orders EWEB to install a new fish screen at the Walterville power canal intake to enhance the passage of downstream migrating fish. See id. at 64,712. EWEB also must construct a tailrace barrier at the Leaburg development, replace the tailrace barrier at Walterville, and modify the left-bank fish ladder and reconstruct a newly designed right-bank ladder at the Leaburg dam. See id. The license also requires EWEB to operate the project according to scheduled ramping rates designed to prevent the stranding of fish. See id. In addition, EWEB is to augment spawning gravel downstream of Leaburg dam to enhance salmonid spawning gravel and monitor the success of fish habitat enhancement measures. See id. at 64,711.
 
 
 [8]
 Minimum instream flow represents the amount "of water that must remain in the bypassed section of the stream and that thus remains unavailable to drive the generators." California v. Federal Energy Regulatory Comm'n, 495 U.S. 490, 494 (1990).
 
 
 [9]
 The Commission's regulations mandate compliance with NEPA during hydropower licensing and relicensing proceedings. See 18 C.F.R. S 2.80(a)-(b) (1998). NEPA requires all federal agencies to file an environmental impact statement before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. S 4332(2)(C) (1994).
 
 
 [10]
 Under section 10(j) of the FPA, the Commission may impose conditions on licensees "based on recommendations received pursuant to the
 
 
 [11]
 These measures included conditions that recommended: imposition of fish mortality standards at the fish screens of Leaburg and Walterville and at the Leaburg rollgates; construction of tailrace barriers; delays in raising the Leaburg Lake water level; delays in the construction of diversion structures at Walterville; the salvage of fish prior to any new construction at Walterville's tailrace; annual inspection of the Walterville tailrace; agency control over final design and monitoring of fishways; and agency enforcement of the licensee's duty to maintain fishways in efficient operating condition. See Order Issuing New License, 78 Fed. Energy Reg. Comm'n Rep. (CCH) at 64,699-700. The Director eventually adopted many of the reclassified recommendations or ordered EWEB to conduct studies regarding their feasibility. See id. at 64,700.
 
 
 [12]
 Licensing decisions made by the Director are final unless timely appealed to the full Commission. Such an appeal is called -somewhat misleadingly -a rehearing petition.
 
 
 [13]
 FPA section 313(b) controls the scope of our jurisdiction and provides, in pertinent part:
 (b) Judicial review
 Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located . . . by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Com mission be modified or set aside in whole or in part. . . . No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is a rea sonable ground for failure so to do. The finding of the Commis sion as to the facts, if supported by substantial evidence, shall be conclusive.
 16 U.S.C. S 825l(b) (1994) (emphasis added).
 
 
 [14]
 It is immaterial in this case that the Commission's interpretation is incorporated in an administrative decision rather than a regulation. "A statutory interpretation adopted by an agency in the course of adjudicating a dispute is entitled to Chevron deference . . . ." Williams v. Babbitt, 115 F.3d 657, 660 n.3 (9th Cir. 1997) (citing 1 Kenneth Culp Davis, Administrative Law Treatise S 3.5, at 120 (1994)), cert. denied 533 U.S. 1117, 118 S. Ct. 1795, 140 L. Ed. 2d 936 (1998).
 
 
 [15]
 A baseline is not an independent legal requirement, but rather, a practical requirement in environmental analysis often employed to identify the environmental consequences of a proposed agency action. See 54 Fed. Reg. 23756 (1989). Although this Court has had few occasions to address this issue, we have stated that "[w]ithout establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988); see also Council on Environmental Quality, Considering Cumulative Effects under the National Environmental Policy Act (visited May 11, 1999) ("The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process.")
 
 
 [16]
 We acknowledge the debate over the propriety, under Chevron, of venturing beyond plain meaning analysis and resorting to traditional implements of statutory construction to ascertain a clear congressional directive. Compare INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48, 107 S. Ct. 1207, 1221-22, 94 L. Ed. 2d 434 (1987) (suggesting that, under the first prong of Chevron, courts should employ "traditional tools of statutory construction") with id. at 454, 107 S. Ct. at 1225 (Scalia, J., concurring) (rejecting this suggestion). This Court has followed Chevron, 467 U.S. at 843 n.9, 104 S. Ct. at 2781-82 n.9, and availed itself of the full range of tools to ascertain legislative intent. See, e.g., Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1053-54 (9th Cir. 1994); Central Montana Elec. Power Coop., Inc. v. Administrator of Bonneville Power Admin., 840 F.2d 1472, 1477 (9th Cir. 1988). We cautiously adhere to this practice as necessary.
 
 
 [17]
 Section 4(e), as amended, provides, in relevant part:
 In deciding whether to issue any license under this Part for any project, the Commission, in addition to the power and develop ment purposes for which licenses are issued, shall give equal con sideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.
 16 U.S.C. S 797(e).
 
 
 [18]
 The relevant surrounding text reads:
 Licenses issued in past years, must be reexamined and justified at relicensing in light of today's standards and concerns.
 Recognizing that there may not be competing applications for many existing projects, the bill requires FERC to make this determination in every case, whether or not there are multiple applicants. The Committee intends all applicants to have knowledge of the standards under which their applications will be evaluated. Thus, in making the determination, FERC must consider a number of factors or criteria listed in the bill and, for each application, make the required findings as to each. These factors or criteria are included to guide the Commission's determination of which final proposal is best adapted. These factors or criteria are not intended to obviate the application of section 10(a) through (j) once a determination is made. Further, the criteria included in the legislation are intended to be applied in a fair and even manner and they are not to be considered by the Commission in a manner which would unfairly skew the selection process in favor of one particular applicant over another.
 The Committee stresses that relicensing is not to be a "rubber stamp," non-public process. The procedures and substance applicable to original licenses, including the treatment of non-developmental values, apply fully in relicensing.
 H.R. Rep. No. 99-507, at 33-34, 1986 U.S.C.C.A.N. at 2520-21.
 
 
 [19]
 Pursuant to various administrative regulations, the Commission analyzes "cumulative impacts" that may result from proposed hydropower actions. See, e.g., 40 C.F.R. S 1508.7 (1998) (defining cumulative impacts as those which result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions"); 40 C.F.R. S 1508.25(c) (defining the scope of an environmental impact statement as potentially including cumulative impacts). Petitioners do not take issue with the Commission's cumulative impacts analysis in this case. Indeed, the Commission devoted an entire section of the final environmental impact statement to such analysis. See Final Environmental Impact Statement, S 4.4, at 4-55 to 4-58.
 
 
 [20]
 American Rivers similarly takes issue with the Commission's characterization of the minimum instream flows under the new license as "enhanced." American Rivers argues that the Commission's improper baseline analysis "allowed these new flows to be termed `enhanced.' " We reject the "illusory flow enhancement argument" in this context. The FPA clearly designs a process under which minimum instream flow recommendations are submitted pursuant to section 10(j) subject to our review under FPA section 313. Contrary to petitioners' assertions, the mere fact that the Commission evaluates minimum instream flow recommendations against an existing project baseline does not impede our ability to discern an illusory flow regime.
 
 
 [21]
 By Executive Order, the CEQ has promulgated comprehensive regulations implementing NEPA. See 42 Fed. Reg. 26,967 (1977).
 
 
 [22]
 As discussed infra at note 23, we state no opinion on the merits of any of the Commission's subsection 10(j)(2) findings.
 
 
 [23]
 In light of our disposition, we do not address whether the Commission's reclassification, rejection, or modification of the 10(j) recommendations at issue would pass muster under a substantial evidence review. See 16 U.S.C. S 825l(b); Northwest Resource Info. Ctr., Inc. v. Northwest Power Planning Council, 35 F.3d 1371, 1385 (9th Cir. 1994) (recognizing that "for a court to fulfill its function under the appropriate standard of review, . . . an agency must provide a reasoned explanation for its actions and articulate with some clarity the standards that governed its decision"); State Water Resources Control Bd., 966 F.2d at 1549 (applying substantial evidence review to the Commission's rejection of a section 10(j) recommendation). We do note, however, that the Commission has failed to speak with clarity on several recommendations that might be within the scope of section 10(j). See, e.g., Final Environmental Impact Statement, table 6-5, at 6-21 (rejecting without discussion agency recommendations for (i) the preparation of a riparian vegetation and enhancement plan; and (ii) the consultation with resource agencies concerning fish and wildlife mitigation plans).
 
 
 [24]
 The section 4(e) language at issue in Escondido mandates that licenses issued under this provision "shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation." 16 U.S.C. S 797(e).
 
 
 [25]
 See infra Part IV.B.
 
 
 [26]
 We note that the congressional record contains several statements which suggest that Senator Wallop's vision of the Commission's section 18 role was anomalous among the legislators. See, e.g., 138 Cong. Rec. H11427-01 (daily ed. Oct. 5, 1992) (statement of Rep. Dingell) ("The prescriptions are mandatory and not subject to balancing [under section 10(a)]. FERC previously raised this unsuccessful argument with respect to mandatory conditions for Federal reservations under section 4(e) in the Supreme Court's Escondido case."); 138 Cong. Rec. H3747-05 (daily ed. May 27, 1992) (statement of Rep. Aucoin) ("Section 1701(b) recognizes that an agency capable of ignoring the laws of nature must share the responsibility for protecting fish, including threatened and endangered species, with agencies that have greater expertise in this crucial area.").