United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 20, 2000 Decided June 23, 2000 

 No. 99-1035

 Conservation Law Foundation, et al., 
 Petitioners

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 State of Maine; Great Northern Paper, Inc., 
 Intervenors

 Consolidated with 
 Nos. 99-1159, 99-1161 & 99-1162

 On Petitions for Review of Orders of the 
 Federal Energy Regulatory Commission

 Sean H. Donahue, Attorney, U.S. Department of Justice, 
argued the cause for the federal petitioners. With him on the 

briefs were Lois J. Schiffer, Assistant Attorney General, 
Peter Coppelman, Acting Assistant Attorney General, James 
C. Kilbourne, Ellen Durkee, and M. Alice Thurston, Attor-
neys. Ellen D. Katz, Attorney, entered an appearance.

 Carol A. Blasi argued the cause for petitioner Conservation 
Law Foundation, et al. With her on the briefs was Alexan-
der W. Sierck. Mona M. Janopaul entered an appearance.

 Kaighn Smith, Jr. argued the cause for petitioner Penob-
scot Indian Nation. With him on the briefs was Mark 
Chavaree.

 Beth G. Pacella, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent. With her on 
the brief were John H. Conway, Acting Solicitor, and Timm 
L. Abendroth, Attorney.

 Andrew Ketterer, Attorney General, and Paul Stern, Depu-
ty Attorney General, were on the brief for intervenor State of 
Maine.

 Catherine R. Connors and Matthew D. Manahan were on 
the brief for intervenor Great Northern Paper, Inc.

 Before: Randolph, Tatel, and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: The Department of the Interior 
and the Environmental Protection Agency, conservation 
groups,1 and the Penobscot Indian Nation petition for review 
of the Federal Energy Regulatory Commission's relicensing 
of a hydroelectric project in north-central Maine. The issues 
presented go mainly to the adequacy of the Commission's 
consideration of the various factors governing license renew-
als. Because the Commission gave sufficient attention to 
these factors and carefully explained its conclusions, the 
petitions are denied.

__________
 1 American Rivers, American Whitewater Affiliation, Appalachian 
Mountain Club, Conservation Law Foundation, and Trout Unlimit-
ed.

 I

 Located on the West Branch of the Penobscot River, the 
Ripogenus and Penobscot Mills Hydroelectric Projects pro-
duce approximately 108 megawatts of power for Great North-
ern Paper mills in Millinocket and East Millinocket, Maine. 
The projects consist of a series of reservoirs, dams, and 
powerhouses. This case focuses on one of the dams--the 
1262 foot long Stone Dam, which is part of the Penobscot 
Mills Project.2 Constructed in 1899, Stone Dam diverts 
water through a canal to a 37 megawatt powerhouse. This 
diversion blocks the main channel of the Penobscot's West 
Branch for a 4.5 mile stretch known as the "Back Channel." 
Because of Stone Dam, the Back Channel receives only 
leakage flows of 2 to 5 cfs (cubic feet per second), except for 
occasional "spillage" when flows exceed power requirements.

 The Penobscot Mills Project, like any project used for the 
"development, transmission, and utilization of power across, 
along, from, or in any of the streams or other bodies of water 
over which Congress has jurisdiction," requires a license from 
the Federal Energy Regulatory Commission. 16 U.S.C. 
s 797(e). When the original license for Penobscot Mills 
expired at the end of 1993, Great Northern applied for a new 
one. The Commission issued a Final Environmental Impact 
Statement analyzing three different proposals regarding the 
new license: the "Applicant's Proposal," in which Great 
Northern would "operate the project[ ] nearly as it has over 
the past 50 years" with some new environmental and recre-
ational enhancements but no increased flows in the Back 
Channel; "Alternative 1," which reflected the Interior De-
partment's recommendations for enhancements including 
minimum flows of 350 to 500 cfs in the Back Channel;3 and 

__________
 2 Petitioners raise no specific objection to the Commission's order 
relicensing the Ripogenus Project, see 77 F.E.R.C. p 61,316 (1996), 
though that order was also listed in the petitions for review.

 3 Interior initially recommended flows of 500 cfs and later in-
creased the recommendation to 945 cfs. See 85 F.E.R.C. at 62,242 

"Alternative 2," recommending "enhancement measures inter-
mediate between those proposed by GNP and those in Alter-
native 1." FEIS at xix. As a baseline for comparison, the 
Commission adopted the terms and conditions of the existing 
license as the "no action" option. The impact statement 
recommended a modified version of Alternative 2 that did not 
include flow requirements for the Back Channel. See FEIS 
at xxiii.

 Shortly after issuance of the final impact statement, the 
Commission granted a new license for Penobscot Mills.4 See 
77 F.E.R.C. p 61,068 (1996). The order conditioned the li-
cense on Great Northern's commitment to wetland enhance-
ments, project boundary expansion, and increased flows into 
Millinocket Stream. See id. at 61,275-79. As to the Back 
Channel, the Commission decided not to order minimum flows 
"given the modest fisheries benefit likely to occur and the 
significant adverse impact on the project's energy benefits," 
id. at 61,276, a decision it affirmed on rehearing, see 85 
F.E.R.C. p 61,316 (1998), and reconsideration, see 86 F.E.R.C. 
p 61,184 (1999).

 II

 "In deciding whether to issue any license [for hydroelectric 
projects,] the Commission, in addition to the power and 
development purposes for which licenses are issued, shall give 
equal consideration to the purposes of energy conservation, 
the protection, mitigation of damage to, and enhancement of, 
fish and wildlife (including related spawning grounds and 
habitat), the protection of recreational opportunities, and the 
preservation of other aspects of environmental quality." 16 
U.S.C. s 797(e). The Federal Power Act also requires the 
Commission to include conditions for the "protection, mitiga-
tion and enhancement" of fish and wildlife affected by the 

__________
n.6. In its petition for rehearing before the Commission, however, 
Interior only "argue[d] for a minimum flow 350 cfs." Id. at 62,242.

 4 During the interim, the Commission had issued annual renewals 
of the Penobscot Mills license under the same terms as the expired 
license. See 16 U.S.C. s 808(a).

project, such conditions to be "based on recommendations 
received pursuant to the Fish and Wildlife Coordination Act 
(16 U.S.C. 661 et seq.) from the National Marine Fisheries 
Service, the United States Fish and Wildlife Service, and 
State fish and wildlife agencies." 16 U.S.C. s 803(j)(1). The 
Commission retains authority to decide that recommended 
conditions are "inconsistent with the purposes" of the FPA or 
other laws, in which event it shall of course reject them. 16 
U.S.C. s 803(j)(2); see United States Dep't of the Interior v. 
FERC, 952 F.2d 538, 544 (D.C. Cir. 1992). While the Com-
mission must give "equal consideration" to environmental 
factors, those factors do not have "preemptive force." 952 
F.2d at 545. The Commission "still is charged with determin-
ing the 'public interest,' i.e., balancing power and non-power 
values." Id.

 The petitioners contend that the Commission's rejection of 
minimum flow requirements in the Back Channel violates 
these Federal Power Act provisions and the National Envi-
ronmental Policy Act, see 42 U.S.C. s 4321 et seq. Their 
arguments can be grouped into two categories: that the 
Commission did not fully recognize the recreational and envi-
ronmental (i.e., nonpower) benefits that would have resulted 
if it had imposed minimum flow requirements; and that the 
Commission inflated the economic costs Great Northern 
would incur from increased Back Channel flows.

 A. Nonpower Issues

 The main argument of the federal petitioners is that the 
Commission should not have treated existing conditions at 
Stone Dam as the baseline "no action" option because this 
caused "the Commission to ignore ongoing impacts directly 
attributable to the new license...." Brief for the Federal 
Petitioners at 29. We think there is nothing to this objection. 
The statute--16 U.S.C. s 803(j)--invites a comparative inqui-
ry. It charges the Commission with the duty of protecting, 
mitigating the damage to, and enhancing "fish and wildlife 
(including related spawning grounds and habitat) affected by 
the development, operation and management of the project." 
To do this properly the Commission must compare what 

might occur to fish and wildlife if the license does not include 
protection for nonpower resources against what will occur 
with conditions imposed. The statutory words "fish and 
wildlife ... affected" by the project seems to refer to the 
fish and wildlife currently existing in the vicinity of the 
project, which supports the Commission's choice of existing 
conditions as a baseline. The quoted language surely cannot 
refer to the animals inhabiting the area in 1899, when the 
project came into being. They are long gone and so cannot 
be "affected" by a Commission licensing decision in the 1990s. 
Granted, it is possible to treat the words "fish and wildlife" 
generically, so that it is not just the animals currently resid-
ing in the region that get protected or enhanced, but different 
species that might be introduced or reintroduced. But this 
view of s 803(j) does not help petitioners because it says 
nothing about whether the baseline for the Commission's 
comparative inquiry should be today or sometime other than 
today. In other words, even if the statute refers generally to 
all "fish and wildlife" it hardly follows that the Commission 
must imagine the Back Channel as it existed before 1899 and 
assess the effect of relicensing by pretending that Stone Dam 
does not exist--at least when no one advocates decommission-
ing the Penobscot Mills Project and tearing down the dam.

 Given the language of s 803(j), the Commission certainly 
had the leeway to conduct its comparative assessments using 
existing conditions as a baseline. To the reasons just men-
tioned, we incorporate by reference those given in American 
Rivers v. FERC, 201 F.3d 1186, 1195-99 (9th Cir. 2000), 
which sustained the Commission's use of an existing condi-
tions baseline as a reasonable construction of s 803(j).

 In any event, the baseline business has the whiff of a red 
herring. Baseline or no baseline, the question is whether the 
Commission has fully examined options calling for greater or 
lesser environmental protection. Here the Commission spoke 
of environmental "benefits" and the economic "costs" to Great 
Northern of options calling for stronger environmental pro-
tection. It could just as easily spoken of economic "benefits" 
to Great Northern from licensing the project and environ-
mental "costs." So long as the Commission adequately exam-

ines both the power and nonpower impacts of recommended 
licensing conditions, we do not see why it matters on which 
side of the equation environmental concerns are placed. In 
issuing the new licenses in these proceedings, the Commission 
adopted twelve of Interior's fourteen recommended environ-
mental enhancements while using an existing conditions base-
line. See FEIS tbls.5-8 to 5-9, at 5-20 to 5-21, adopted at 77 
F.E.R.C. at 61,275. This in itself proves that the federal 
petitioners are mistaken in thinking that an existing condi-
tions baseline preordains the rejection of any new conditions 
for the protection of fish and wildlife. So long as the Com-
mission examines options that include recommended environ-
mental enhancements, its choice of a baseline will not prevent 
it from giving "equal consideration" to nonpower values.5

 Petitioners also argue that the Commission did not give 
"equal consideration" to nonpower values because it refused 
to assess in economic terms the nonpower benefits that would 
result from restoring significant flows to the Back Channel. 
Restored flows, petitioners believe, would attract anglers and 
whitewater rafting enthusiasts to this 4.5 mile stretch of river. 
In the rehearing order, the Commission explained its refusal 
to quantify these nonpower benefits: "[T]he public-interest 
balancing of environmental and economic impacts cannot be 
done with mathematical precision, nor do we think our statu-
tory obligation to weigh and balance all public interest consid-
erations is served by trying to reduce it to a mere mathemati-
cal exercise.... [F]or non-power resources such as aquatic 
habitat, fish and wildlife, recreations, and cultural and aesth-
etic values, to name just a few, the public interest cannot be 
evaluated adequately only by dollars and cents." 85 F.E.R.C. 
at 62,244-45. Certainly nothing in the statute requires the 
Commission to place a dollar value on nonpower benefits. 
Nor does the fact that the Commission assigned dollar figures 
to Great Northern's economic costs require that the Commis-
sion do the same for nonpower benefits: " 'Equal consider-

__________
 5 We also agree with the American Rivers court, see 201 F.3d at 
1199-2001, that the Commission's thorough examination of a range 
of licensing alternatives satisfies NEPA's procedural requirements, 
see 42 U.S.C. s 4332(2)(C)(iii).

ation' is not the same as 'equal treatment.' " State of Califor-
nia v. FERC, 966 F.2d 1541, 1550 (9th Cir. 1992). The 
refusal to quantify nonpower benefits did not "stack the deck" 
against those concerns. The Commission approved "a variety 
of enhancements related to instream flows for fisheries and 
recreation, stabilization of impoundment levels, wetlands, re-
creational facilities, shoreline protection, and cultural re-
sources." 85 F.E.R.C. at 62,245; see also id. at 62,245 n.31. 
A critical factor in the Commission's refusal to impose mini-
mum flows was the increased power expenses that would 
result, not the Commission's failure to appreciate nonpower 
values. Minimum flows of 350 cfs in the Back Channel would, 
the Commission concluded, increase annual power expenses 
by $916,300; the total increase in annual power costs of the 
enhancements the Commission approved for Penobscot Mills 
was $262,600. See FEIS tbl.5-3, at 5-13.

 Petitioners' final complaint under this heading is that the 
Commission did not focus on the possibility of a brook trout6 
fishery in the Back Channel. In its original order, the 
Commission observed that "fish species such as brook trout, 
eels, minnows and suckers would benefit slightly from the 
recommended flows, [but] the Back Channel would at best 
only produce several hundred adult land-locked salmon." 77 
F.E.R.C. at 61,275. The order then explained why the Back 
Channel would not be a desirable habitat for land-locked 
salmon, but did not mention brook trout again. See id. On 
rehearing, the Commission stated that there was "a low 
likelihood of re-establishing limited habitat" for brook trout. 
85 F.E.R.C. at 62,243. It relied, at least in part, on "a Maine 
Department of Inland Fish and Wildlife priority to maintain 
and protect fishery resources elsewhere in the project area." 
Id. "During dry years, requiring minimum flows above leak-
age in the Back Channel could affect the ability to maintain 

__________
 6 A "brook trout" (Salvelinus fontinalis) is actually a char. 
"Chars are distinguished from trout by their mouth structure; the 
vomerine bone in the center of a trout's mouth has teeth all along it, 
while the vomer of the char has only a few teeth on the front end of 
the bone." A.J. McClane, ed., McClane's New Standard Fishing 
Encyclopedia and International Angling Guide 207 (1998 ed.).

constant flows in the West Branch and Millinocket Stream, 
and lake level in the North Twin reservoir, which could cause 
stress and potential damage to salmon and trout populations 
in those areas." Id. Given the plentiful brook trout fisheries 
in the Penobscot Mills-Ripogenus area, the Commission can-
not be faulted for believing that adding another 4.5 mile 
stretch would have little benefit. See id.

 The Federal Power Act requires the Commission to consid-
er the recommendations of the United States Fish and Wild-
life Service and State fish and wildlife agencies.7 See 16 
U.S.C. s 803(j)(1). Even when the recommendations of fed-
eral and state agencies are in concert, those agencies do not 
have "veto power" over Commission licensing decisions. De-
partment of Interior, 952 F.2d at 545 (citing National Wild-
life Fed'n v. FERC, 912 F.2d 1471, 1480 (D.C. Cir. 1990)). In 
this case the federal and State agencies disagreed about the 
desirability of promoting a brook trout fishery in the Back 
Channel. The Commission adequately explained why Interi-
or's recommendation was inconsistent with the purposes of 
the FPA. See 16 U.S.C. s 803(j)(2). Not only would Interi-
or's proposal curtail power production from the Penobscot 
Mills Project, but the Commission had reason to believe a 
Back Channel brook trout fishery would actually do more 
harm than good to the region's fish habitats.

 B. Power Issues

 The Commission stated that the "reduction in the project's 
... annual energy benefits for the Back Channel flows out-
weighs the enhancement in aquatic resources that the flows 
would produce." 77 F.E.R.C. at 61,276. The Commission 
calculated this annual reduction as $916,0008 (6% of the 

__________
 7 The same provision requires the Commission to "attempt to 
resolve any inconsistency" between its proposed license and other 
agency recommendations. See 16 U.S.C. s 803(j)(2). The Commis-
sion did so in a "dispute-resolution meeting with representatives 
from Interior on February 8, 1996." 77 F.E.R.C. at 61,274.

 8 The Commission concluded that the annual cost of Interior's 
request for 950 cfs would be $2.5 million, or 16% of the project's 
power production. See 77 F.E.R.C. at 61,274-75.

project's total benefits), see id., based on the price of purchas-
ing replacement power from the least-cost alternative 
source--Bangor Hydro & Electric Company,9 see FEIS 
s 2.4.4, at 2-33 to 2-34.

 Petitioners complain that the Commission failed to consider 
the alternative of Great Northern conserving energy, some-
thing the statute requires the Commission to consider. See 
16 U.S.C. ss 797(e), 808(a)(2)(C); see also 42 U.S.C. 
s 4322(2)(E); 40 C.F.R. s 1502.14. They put it this way: 
"By considering conserved power as the least cost alternative 
to hydropower, rather than the more expensive purchased 
power used by the Commission, the cost of environmental 
enhancements, such as Back Channel flows, are much lower." 
Final Brief for Petitioners Conservation Law Foundation, et 
al. and Trout Unlimited at 12. But the Commission did 
consider the alternative of energy conservation. After exam-
ining Great Northern's plant data, the Commission concluded 
that the mills had recently increased energy efficiency as the 
result of plant modernization efforts and the use of steam 
generation and that no reliable evidence supported petition-
ers' view that "enormous conserved power potential" still 
existed at the mills. See FEIS E-3, cited in 77 F.E.R.C. at 
61,269 n.16; id. at E-24. The final impact statement also 
noted that Great Northern, "operating as a private for-profit 
enterprise, would have a strong economic incentive to maxim-
ize savings from conservation and not waste electric power, 
particularly as it manufactures an energy-intensive product." 
Id. at E-23, cited in 85 F.E.R.C. at 62,243 n.14. Any 
conservation that did occur would be "used to displace higher-
cost fossil fuel power ... [s]ince the entire output from the 
two projects supplies only a portion of GNP's total annual 
power needs...." Id., cited in 85 F.E.R.C. at 62,243 n.14. 
We see no ground for disagreeing with this reasoning. The 
Penobscot Mills (31% of energy needs) and Ripogenus (19% 
of energy needs) Projects supply only half of the energy 

__________
 9 The Commission (as well as the parties) assume that Great 
Northern would purchase fossil fuel power--not hydro power--from 
Bangor.

needed for Great Northern's paper manufacturing. See 77 
F.E.R.C. at 61,242, 61,270. Until the company's conservation 
measures achieved a 50% reduction in its energy needs 
(something no one contends is likely), the consequence of 
increased energy efficiency would be a decrease in the compa-
ny's purchase of other, more expensive, sources of power. 
Thus, the "replacement cost" of reduced hydroelectric power 
would still be the price of power from Bangor, namely 
$916,000.10

 Petitioners' other cost-side argument is that the Commis-
sion relied on unsupported claims that the increased cost of 
Back Channel flows would result in job losses at the Great 
Northern mills. This misinterprets the Commission decision. 
In the original order, the Commission recognized "Great 
Northern's need for inexpensive power to remain competitive 
in its paper making operations." 77 F.E.R.C. at 61,275. 
Then, in a footnote, the Commission stated that it could not 
verify the company's claim that flows in the Back Channel 
"would result in the loss of approximately 238 jobs," so the 
Commission was just relying on what it did know--that 
"Great Northern's operating costs are high compared to other 
paper manufacturers, and cost increases could reduce the 
company's competitiveness." Id. at 61,275 n.31 (italics add-
ed). On rehearing, the Commission once again indicated that 
it was only relying on the risk of economic harm: "A 350-cfs 
minimum flow would reduce the annual energy benefit of 
Penobscot Mills substantially, with the possibility of causing 
Great Northern to further curtail operations at, or close, its 
paper mills...." 85 F.E.R.C. at 62,242 (italics added) (foot-
notes omitted). There is ample evidence in the record to 
support the Commission's findings. Papermaking is a highly 
competitive industry, see FEIS s 5.3.5, at 5-14, cited in 77 
F.E.R.C. at 61,275 n.31; Great Northern is a high cost 

__________
 10 Although conservation would not change the $916,000 replace-
ment cost of increased Back Channel flows, it would reduce Great 
Northern's total energy costs. But it was the magnitude of the 
replacement cost, not the impact it would have on the company's 
overall economic condition, that led the Commission to reject the 
proposal for increased Back Channel flows. See infra note 11.

producer compared to other paper manufacturers, see id., 
cited in 77 F.E.R.C. at 61,275 n.31, and Great Northern 
recently closed some Millinocket facilities, resulting in the 
elimination of about 350 jobs, see 85 F.E.R.C. at 62,242 n.9.11

 III

 The Penobscot River Basin is "home to the Penobscot 
Indian Nation (PIN), much of whose cultural heritage is 
closely associated with the river and the resources it pro-
vides." FEIS s 3-1, at 3-1. Under the Maine Indian Claims 
Settlement Act, the " 'Penobscot Indian Reservation' " is de-
fined as "the islands in the Penobscot River reserved to the 
Penobscot Nation by agreement with the States of Massachu-
setts and Maine consisting solely of Indian Island, also known 
as Old Town Island, and all islands in that river northward 
thereof that existed on June 29, 1818...." 25 U.S.C. 
s 1722(i) (incorporating 30 Me. Rev. Stat. Ann. s 6203(8)). 

__________
 11 Petitioners' pre-argument motion to remand the case to the 
Commission for the taking of additional evidence, see 16 U.S.C. 
s 825l(b), is denied. In November 1999, Great Northern Paper 
submitted an application to the Commission seeking the transfer of 
the Penobscot Mills license to a new subsidiary, Great Northern 
Energy. A subsidiary of Duke Energy Corporation has a minority 
interest in Great Northern Energy. Petitioners believe these de-
velopments affect two of the Commission findings: that Back 
Channel flows could threaten the mills' economic viability and that 
expanded conservation efforts are not plausible. We do not see, 
however, how these developments could alter the two dominant 
factors in the Commission's decision: the replacement energy cost 
of $916,000 and the minimal (perhaps even detrimental) effect on 
fisheries. See 77 F.E.R.C. at 61,275 ("Interior's recommendations 
... would entail a significant reduction in energy benefits on behalf 
of only marginal improvements to aquatic habitat...."); id. at 
61,276 ("Given the modest fisheries benefit likely to occur and the 
significant adverse impact on the project's energy benefits, we are 
not requiring minimum flows for the Back Channel."). It does not 
"clearly appear that the new evidence would compel or persuade to 
a contrary result," so we deny the motion. Friends of the River v. 
FERC, 720 F.2d 93, 99 n.6 (D.C. Cir. 1983) (quoting Rocky Moun-
tain Power Co. v. FERC, 409 F.2d 1122, 1128 n.21 (D.C. Cir. 1969)).

The Penobscot Nation claims that its reservation includes the 
islands in the West Branch of the Penobscot. The State of 
Maine disagrees, contending that nothing "even remotely 
suggests that any land or islands in any branches or tributar-
ies of the Penobscot River were being reserved" to the Tribe. 
FEIS s 4.11.1.2, at 4-69.

 The land issue is of some consequence to this case. The 
Tribe believes it should have been a consulting party to the 
"programmatic agreement" the Commission adopted in fulfill-
ing its duty to take "into account the effect of [the licenses on 
any site] that is included in or eligible for inclusion in the 
National Register" of Historic Places. 16 U.S.C. s 470f; see 
also 36 C.F.R. s 800.13 (authorizing agencies to delegate this 
responsibility to "programmatic agreements"). An Indian 
Tribe must be named a concurring party to a programmatic 
agreement when the agency "undertaking will affect Indian 
lands." 36 C.F.R. s 800.1(c)(2)(iii). But the Penobscot Nation 
had not established legal title to the islands in the West 
Branch, and so the Commission did not confer consulting 
party status on it. See 85 F.E.R.C. at 62,245. The Commis-
sion made clear on rehearing that it was not determining the 
merits of the Tribe's land claims and that, should the Tribe 
establish legal title to the lands, it would be added as a 
consulting party. See id. at 62,245 & n.35. We agree that 
the Commission was under no obligation to make the Penob-
scot Nation a consulting party; nor was its failure to do so an 
abuse of discretion.

 The Tribe also contends that increased flows in the Back 
Channel would provide its members with canoe access to 
religious sites, which means that the Commission violated the 
American Indian Religious Freedom Act. This statute re-
quires the "United States to protect and preserve for Ameri-
can Indians their inherent right of freedom to believe, ex-
press, and exercise the traditional religions of the American 
Indian ... including but not limited to access to sites...." 
42 U.S.C. s 1996. The Commission's response is conclusive: 
even with flows of 350 cfs, canoe navigation of the Back 
Channel would not be possible. See 77 F.E.R.C. at 61,275 
n.39. The Commission also noted that "there is a nearby 

canoe route on the Penobscot that permits canoe passage to 
the same sites"--presumably the route the Tribe has used 
since 1899. See 85 F.E.R.C. at 62,243. Federal agencies are 
to consider, "but not necessarily to defer to, Indian religious 
values." Wilson v. Block, 708 F.2d 735, 747 (D.C. Cir. 1983). 
The Commission has performed its duty under this legisla-
tion. 12

 The petitions for review are denied.

__________
 12 The Tribe raises several other arguments that do not warrant 
written exposition. These have been considered and rejected.