**IDAHO RIVERS UNITED
and American Rivers,
Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

**United States Fish and Wildlife Service
and Idaho Power Company,
Respondent–Intervenors.**

No. 05–72513.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 2006.

Decided July 12, 2006.

Laurence J. Lucas, Esq., Law Office of Laurence J. Lucas, Sara Denniston Eddie, Esq., Advocates for The West, Boise, ID, for Petitioner.

Beth G. Pacella, Esq., Magalie Roman Salas, Secretary, Robert H. Solomon, Solicitor, FERC—Federal Energy Regulatory Commission, Washington, DC, for Respondent.

James B. Vasile, Esq., Davis Wright Tremaine LLP, Washington, DC, for Respondents–Intervenors.

David C. Shilton, Esq., DOJ—U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Respondent/Respondents–Intervenors.

Before THOMPSON, TASHIMA, and CALLAHAN, Circuit Judges.

## MEMORANDUM *

The petitioners seek review of the Federal Energy Regulatory Commission's ("FERC") relicensing of five hydroelectric projects located on the Snake River and operated by respondent-intervenor Idaho Power Company ("IPC").[1] The petitioners essentially seek to have the projects strictly controlled in a manner that allows the river to run free without reserving river water in reservoirs for later hydroelectric generation, which causes fluctuations to the river's water levels. They claim that such fluctuations jeopardize the continued existence of white sturgeon and three species of endangered or threatened snails. They request that we vacate the new licenses and remand the matter for FERC to consider additional evidence of the projects' effects on fish and wildlife. We have jurisdiction under the Federal Power Act to review FERC's final orders, 16 U.S.C. § 825l (b), and we deny the petition.

1. FERC and respondent-intervenor United States Fish and Wildlife Service ("FWS") question whether the petitioners have Article III standing to seek review of the license orders and, more specifically, whether the petitioners have made a showing of particularized injury. A party invoking the jurisdiction of a federal court must meet the "case or controversy" requirement of Article III by alleging facts necessary to establish the party's standing to sue. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "Petitioners who 'allege (1) personal injury (2) fairly traceable to the [respondent's] allegedly unlawful conduct and (3) likely to be redressed by the requested relief' establish Article III standing." *Defenders of Wildlife v. U.S. Envtl. Prot. Agency,* 420 F.3d 946, 956 (9th Cir.2005) (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). "An association has standing to bring suit on behalf of its members

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36–3.

1. Because the parties are familiar with the facts and procedural history, we do not restate them here except as necessary to explain our disposition.

when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

■ The petitioners have submitted declarations of three individual members, each of whom seeks to redress injuries to fisheries and to recreational or other interests in the Snake River.[2] These declarations sufficiently establish that the petitioners have Article III standing to bring claims on behalf of their individual members because the declarations demonstrate personal and particularized injuries due to the operation of the hydroelectric projects and that this court's grant of relief would likely redress their claimed injuries.

■ 2. FERC also argues that the petitioners' contentions regarding the recommendations made in accordance with Section 10(j)[3] to end all load-following operations are moot because FWS and the state resource agency in essence withdrew those recommendations after entering into a settlement agreement so that studies regarding endangered or threatened snails could be conducted at the projects. In response, the petitioners state that their 10(j) claims are not entirely moot because they contend that FERC should have, but failed to, specifically state its reasons for not accepting certain 10(j) recommendations in its licensing decisions. While recognizing that the state resource agency chose to "temporarily put [its] recommendation aside during the course of the proposed studies" called for in the settlement agreement, the petitioners assert that the settlement agreement only addressed listed snails. Consequently, the petitioners contend that the settlement agreement did not moot the 10(j) run-of-river recommendations related to sturgeon.

We agree with the petitioners that their contentions regarding the pre-settlement, load-following recommendations concerning sturgeon are not moot. The terms of the settlement agreement do not affect the run-of-river recommendations for sturgeon mitigation measures.

■ 3. FERC and IPC also question whether the petitioners, as contrasted to the entities that made 10(j) recommendations, have statutory standing under Section 10(j) to challenge FERC's alleged failure to address recommendations concerning sturgeon. Having found no legal

---

2. "Article III's standing requirement does not apply to agency proceedings" and, therefore, the petitioners "had no reason to include facts sufficient to establish standing as a part of the administrative record." *Nw. Envtl. Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir.1997). We consider the declarations "not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction." *Id.; see also Beck v. U.S. Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir.1992) (accepting appellant-intervenors' supplemental declarations alleging particularized injury because they were not required to establish standing until they appealed).

3. Pursuant to the Electric Consumers Protection Act, or what is more commonly referred to as Section 10(j), each FERC license must include conditions for environmental protection to enhance fish and wildlife resources based on the recommendations that FERC receives from state and federal resource agencies. Pub.L. No. 99–495, 100 Stat. 1243 (1986) (codified at 16 U.S.C. § 803(j)(1)). Section 10(j) recommendations are not mandatory and, after giving the recommendations due weight, FERC may determine to modify those recommendations or decline their adoption altogether. *Id.*

authority on this issue, which affects only the scope of our admitted jurisdiction, we dispose of the issue by first assuming that the petitioners have statutory standing and then determining that the petitioners' 10(j) claim would fail on the merits. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 98 & n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (continuing to permit courts to bypass questions of statutory standing in order to reach the merits (citing *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,* 414 U.S. 453, 465 n. 13, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974))).

The petitioners' 10(j) claim properly concerns only the C.J. Strike Project license, as the other two historical load-following projects (Bliss and Lower Salmon Falls) have switched to run-of-river operations. Notwithstanding the petitioners' allegations that load-following operations at Bliss and Lower Salmon Falls are only temporarily suspended, the record reveals that the Bliss and Lower Salmon Falls licenses mandate run-of-river operations at all times during their 30–year terms except when load-following operations are demanded in accordance with the settlement agreement's requirement that IPC conduct snail studies at both locations during a six-year study period.

Furthermore, the record contradicts the petitioners' contention that FERC did not state why it rejected the 10(j) recommendations made by FWS and the state resource agency. Indeed, FERC explained its rationale for not adopting the run-of-river recommendations, not only with respect to C.J. Strike, but also with respect to Bliss and Lower Salmon Falls. Based on the draft environmental impact statements ("EIS"), FERC preliminarily determined that the run-of-river recommendations may be inconsistent with the Federal Power Act's comprehensive-planning standard and public-interest standard. FERC

explained that run-of-river operations at Lower Salmon Falls and Bliss would provide limited benefit to the sturgeon population. In addition, FERC concluded that run-of-river operations at the C.J. Strike Project "would not likely improve the recruitment of sturgeon," and "would provide only modest benefits to white sturgeon rearing life stages." Moreover, FERC noted that "[i]mmediate implementation of mitigation measures specific to white sturgeon is not necessary" because "[t]he species is neither endangered nor threatened and the operating requirements of the licenses will maintain current levels or protection," and that the water-quality requirements "will improve habitat for sturgeon and other aquatic species."

FERC was also concerned that run-of-river operations would prevent IPC from shaping river flows to match daily fluctuations in power demand, requiring the company to spend millions of dollars to find replacement on-peak power from other sources and expend non-renewable energy resources that would themselves lead to negative externalities, such as environmental pollution. We hold that FERC sufficiently explained its departure from the 10(j) recommendations concerning sturgeon along with its conclusion that the potential gains to sturgeon "are not worth the cost in terms of the projects' loss of operational flexibility to match fluctuating power demands and the associated loss of dependable capacity."

■ 4. The petitioners allege that FERC's failure to create a policy mandating that all of IPC's hydroelectric projects operate in run-of-river mode is the result of an unequal cost-benefit analysis. The petitioners claim that "FERC unfairly weighted the scales[ ] by employing unreasonable assumptions to overstate the financial costs that [IPC] might face[,] while failing even to assess—much less quanti-

fy—the full economic and non-economic benefits of fish, wildlife and recreation on the mid-Snake River, which are harmed by load following operations."

The Federal Power Act gives FERC broad guidelines to apply in its hydroelectric-licensing decisions:

> In deciding whether to issue any license ... for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

16 U.S.C. § 797(e). The FPA also provides:

> [T]he project adopted ... shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway ... for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses[.]

*Id.* § 803(a)(1). These provisions recognize the numerous beneficial public uses of the waterways and courts have interpreted them as charging FERC with determining the "public interest" by balancing power and non-power values. *See Udall v. Fed. Power Comm'n,* 387 U.S. 428, 450, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967) ("The test is whether the project will be in the public interest."); *see also Am. Rivers v. FERC* ("*American Rivers*"), 201 F.3d 1186, 1201 (9th Cir.1999) ("[T]he [Act] establishes an elaborate regulatory regime which charges [FERC] with the responsibility to balance the interests of hydropower licences and other participants in the licensing process.").

In view of these broad guidelines, we have determined that Congress "left the complex policy decision about how far FERC should extend its regulatory tentacles up to FERC itself. Put another way, it has left that decision to the discretion of the agency." *Bear Lake Watch, Inc. v. FERC,* 324 F.3d 1071, 1074 (9th Cir.2003) (citations omitted). FERC's factual determinations cannot be set aside by this court if based on substantial evidence. *Id.* at 1076 (citing *Steamboaters v. FERC,* 759 F.2d 1382, 1388 (9th Cir.1985)). "Substantial evidence constitutes more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

Applying this standard of review to the instant case, our focus is not on whether we agree with the balance of factors that FERC determined in the licensing proceedings, but whether FERC considered all of the germane factors and provided a reasoned explanation. *Id.* If FERC did so, its decision must stand. *Id.* The record shows that FERC's cost-benefit analysis treated fishery values equally with power values in determining not to employ strict run-of-river operations for all of the hydroelectric projects throughout the entire 30–year term of the new licenses. This is consistent with the Federal Power Act's mandate that it give equal consideration to developing power, energy conservation, and the protection, mitigation of damage to, and enhancement of fish and wildlife. FERC considered all of the germane factors and substantial evidence in the record supports FERC's reasoned determination in balancing the power and non-power values associated with its relicensing determination that four out of the five projects

would be operated in run-of-river mode, as the petitioners desire, with the exception of one project that will continue to utilize the contested mode of operation and a brief study period examining impacts on endangered or threatened snails at two of the other projects.

■ 5. In addition, the petitioners complain that FERC indefinitely put off its decision on what protections or mitigation measures might be required for sturgeon. They argue that the proper action would have been for FERC to "consider fishery issues before, not after, issuance of [a] license." In the petitioners' view, FERC's deferral of a sturgeon protection plan is inconsistent with this court's decision in *Confederated Tribes & Bands of the Yakima Indian Nation v. FERC ("Yakima")*, 746 F.2d 466 (9th Cir.1984).

The petitioners misconstrue both what FERC did with respect to the sturgeon and what *Yakima* requires. Contrary to the petitioners' assertion, FERC did not defer the study and resolution of sturgeon protection issues into the indefinite future. Consistent with the 10(j) recommendations, each license requires IPC to submit for FERC's approval a "White Sturgeon Conservation Plan" within *one year* of license issuance.[4] This requirement completely rebuts the petitioners' allegation that the company "now has no incentive to develop a sturgeon plan that takes the

steps needed to protect and restore that fishery."

More importantly, in *LaFlamme v. FERC*, 945 F.2d 1124 (9th Cir.1991), we clarified our holding in *Yakima* and approved deferral of FERC's decisions on certain fishery issues pending post-licensing studies and monitoring:

> Unlike *Yakima*, however, this case involves the issuance of a license with full consideration of the environmental issues. The order does leave open the possibility of amending the license based on the results of post-licensing monitoring, but we have previously upheld the exercise of such authority by [FERC]. We hold that there was no error in [FERC's] decision to allow the possibility of modifications to the requirements of the license based on post-licensing monitoring, as [FERC] performed the necessary pre-licensing studies.

*Id.* at 1130.[5]

FERC's subject actions with respect to sturgeon comply with the guidance set forth in *Yakima* and its progeny. The record contains ample evidence that FERC examined and considered sturgeon issues *prior to* license issuance. In *Yakima*, on the other hand, an EIS had not even been drafted and FERC deferred *all* fish and wildlife measures until after relicensing, thereby completely failing to consider the license renewal's potential impact

---

4. The conservation plan was already being developed in cooperation with state and federal agencies and tribes when FERC issued the licenses.

5. In *United States Dep't of Interior v. FERC*, 952 F.2d 538 (D.C.Cir.1992), the D.C. Circuit relied on our decision in *LaFlamme* as clarifying *Yakima*:

> *Yakima* at most imposes on [FERC] the duty to consider and study the environmental issue before granting a license. *Yakima does not require any heightened degree of certainty for environmental facts, nor does it*

*imply that all environmental concerns must be definitively resolved before a license is issued.* Read this way, *Yakima* simply endorses the unstartling principles that an agency must establish a record to support its decisions and that a reviewing court, without substituting its own judgment, must be certain that the agency has considered all factors required by the statute. The Ninth Circuit itself gave *Yakima* this interpretation in *LaFlamme v. FERC.*

*Id.* at 546 (emphasis added). We have endorsed the D.C. Circuit's reading of *Yakima. American Rivers*, 201 F.3d at 1199.

on fish and wildlife. Here, as part of its license applications, IPC submitted the results of extensive studies and analysis of existing information about sturgeon. The EISs for all five projects exhaustively addressed sturgeon issues, thoroughly evaluating all relevant public-interest considerations.[6] We reiterate that despite the fact that the species is neither endangered nor threatened, FERC nonetheless determined that the approved project operations would at least maintain current levels of protection and that the water-quality and habitat improvements required by the licenses would benefit sturgeon.[7]

In this context, FERC reasonably delayed imposing specific mitigation measures pending the filing of the sturgeon protection plan. That plan had been in the works for years before the new licenses were issued and included input from a number of state and federal resource agencies and tribes. The plan is intended to provide improved information on which to make a decision regarding specific sturgeon mitigation measures, and the parties have advised us that the plan was in fact filed with FERC in August 2005. Accord-ingly, FERC's brief deferral of the sturgeon protection issues for a development of the facts that will inform FERC's ultimate sturgeon decision is reasonable, entitled to deference, and does not run afoul of the principles set forth in *Yakima*.

■ 6. The petitioners' final argument is that we should vacate and remand the license orders pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, because those orders rely on and incorporate FWS's final biological opinion ("BO"), which, according to the petitioners, is arbitrary, capricious, and violates the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, by failing to consider both the long-term impacts of load-following operations on listed snails and the best scientific evidence that such operations harm listed snails. While we have jurisdiction pursuant to the Federal Power Act over FERC's reliance on FWS's final BO in making its licensing decisions, our jurisdiction does not extend to whether FWS complied with the Endangered Species Act in issuing its biological opinion. *Aluminum Co. of Am. v. Adm'r, Bonneville Power*

6. The petitioners also contend that FERC's deferral of a sturgeon protection plan violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, because, in the petitioners' words, "NEPA requires FERC to consider all environmental consequences, and means to mitigate those consequences, in a single EIS." This is an overstatement because we require only that FERC adequately consider and disclose the environmental impact of its actions with a reasonably thorough discussion of probable environmental consequences. *American Rivers*, 201 F.3d at 1194–95. An examination of the extensive EISs for the five projects (comprising approximately 1,200 pages) leads us to the inescapable conclusion that NEPA's requirements have been satisfied in this case. FERC's analysis considered, disclosed, and thoroughly discussed all probable environmental consequences. To the extent that the petitioners' argument is based on their concern that "there is no assurance that [FERC] will even follow NEPA procedures in the future, after it receives [IPC's] Plan," their argument is speculative. If the petitioners believe that FERC's future actions will violate NEPA's requirements, they presumably may challenge those actions at that time.

7. The licenses at issue contain a variety of measures to protect and enhance sturgeon and other fish and wildlife, including minimum water flows, monitoring temperature and levels of dissolved oxygen and gas in the river water, wetlands construction, aquatic vegetation removal, spring habitat protection, and run-of-river operations at Lower Salmon Falls and Bliss. It should also be noted that FERC found that many factors unrelated to the company's operation of the projects may be contributing to the decline of the white sturgeon, such as the over-harvesting of sturgeon, genetic isolation, and entertainment fishing.

*Admin.* ("*ALCOA*"), 175 F.3d 1156, 1160 (9th Cir.1999). FWS's actions in preparing the final BO are relevant only to the extent that they shed light on whether FERC's reliance on that BO was arbitrary or capricious, as the petitioners claim. *Id.; see also* 5 U.S.C. § 706(2).

Under the arbitrary and capricious standard, when a dispute "implicates substantial agency expertise" and "involves primary issues of fact," courts must defer to " 'the informed discretion of the responsible federal agencies.' " *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 375–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). FWS is the agency that is principally responsible for administering the Endangered Species Act with respect to the snail species at issue (16 U.S.C. § 1533; 50 C.F.R. § 402.01(b)) and "deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,* 273 F.3d 1229, 1236 (9th Cir.2001) (internal citations omitted). Thus, our review is limited to determining whether the agency considered the relevant factors and rationally explained its choices. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation* ("*Southwest Center*"), 143 F.3d 515, 522–23 (9th Cir.1998).

The petitioners incorrectly interpret the BO to be a "placeholder BO, which consults just over the first five years of project operation, and leaves for another day determining whether the remaining 25 years of the FERC licenses will or will not likely jeopardize the endangered snail[s]." The BO, however, expressly analyzes impacts of the projects for the entire 30–year license term, both during the first five years of the study period and throughout the following 25 years of the projects' op-

eration. While the settlement agreement provides an opportunity to reassess the conclusions of the BO after the first five years of data gathering, the BO does not restrict its analysis to impacts during the study period.

The petitioners criticize FWS for reversing course from its draft BOs, in which FWS preliminarily determined that the licensed projects would jeopardize the continued existence of listed snails, to the final BO, which states FWS's conclusion that the licenses would pose "no jeopardy" to the snails. The petitioners specifically argue that the final BO is arbitrary and capricious because FWS ignored evidence that load-following operations harm snails.

The petitioners' argument is not built on solid ground because it merely relies on the draft BOs to show that FWS arbitrarily changed its position in its final BO. We have held that the FWS is entitled to change its mind in a final BO, where, as here, its final position is reasonable and sufficiently supported by the record.

In *Southwest Center,* FWS issued a final BO on the Bureau of Reclamation's continued operation of Lake Mead, finding that planned operations would likely jeopardize a species of bird, but that implementation of certain reasonable alternatives could avoid jeopardy without requiring a change in project operations. We rejected a claim that FWS had irrationally reversed position from its draft BO, which had preliminarily found that project operations had to be changed to avoid jeopardy. We determined that there was no violation of the Administrative Procedure Act because FWS's further consideration of the matter entitled FWS to reverse its position. 143 F.3d at 523. *Southwest Center* makes clear that the relevant inquiry is whether the final BO draws a rational connection between the facts and FWS's ultimate conclusion regarding jeopardy.

Even if the draft BOs were relevant, there is a reasonable explanation for the different conclusion reached in the final BO. The proposed licenses and their attendant conditions had changed significantly as a result of the settlement agreement. Under that agreement, the two projects with the greatest potential to adversely affect the snails' recovery areas, Bliss and Lower Salmon Falls, will be operated in run-of-river mode for all but two years, instead of load-following mode for the entire license period as was assumed in the draft BOs. This significant change provides ample justification for the different conclusion drawn in the final BO. Perhaps the motivating factor for the petitioners' attack on the final BO is the petitioners' hunch that "political appointees" meddled in the process to change FWS's mind. The record provides absolutely no support for this speculative theory. As just explained, what is apparent from the record is that the operational changes created by the settlement agreement sharply reduced the amount of load-following operations in the areas that are most critical to listed snails, thereby changing the assumptions guiding FWS's analysis.

Moreover, the final BO reasonably determines that jeopardy to the listed snails is not likely. To "jeopardize the continued existence of a species" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The petitioners do not dispute that FWS's determination of whether harmful impacts will cause jeopardy requires a complex judgment regarding the significance of particular adverse effects on a species, including the duration and extent of those effects, what proportion of the population of a species will be affected, and other factors. This is a judg-

ment that is squarely within FWS's expertise and one to which we accord substantial deference. *Southwest Center,* 143 F.3d at 523; *ALCOA,* 175 F.3d at 1161–62. Here, the record shows that FWS's "no jeopardy" finding for each of the three listed snails is supported by substantial evidence and the petitioners can point to no record information or data that "undermines seriously" the BO. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,* 898 F.2d 1410, 1416 (9th Cir.1990). Therefore, we conclude that FERC's consideration of the final BO was neither arbitrary nor capricious.

\* \* \* \* \*

The petitioners have Article III standing to allege that FERC acted arbitrarily and capriciously in declining to strictly require run-of-river operations and other environmental-mitigation measures, and that FERC's license orders are not supported by substantial evidence. Although the petitioners's contentions concerning the 10(j) sturgeon recommendations are not moot, their 10(j) claim fails on the merits. The record establishes that FERC acted reasonably and there is substantial evidence to support FERC's decision to relicense the five hydroelectric projects. FERC faithfully fulfilled its statutory duties to give equal consideration to environmental and power values in determining whether the relicensed projects are in the public interest. The fact that the petitioners may disagree with the factual findings and judgments reached by expert agencies on complex issues does not constitute a ground for judicial relief. The relicensed projects resulted from FERC's thorough and careful analysis of vast amounts of information. The record shows that FERC designed the relicensed projects to preserve aquatic resources, accommodate other beneficial uses of the Snake River, and gather additional information neces-

sary to better protect environmental resources. For all of the foregoing reasons, the petition for review is **DENIED**.